Affirmed by published opinion. Judge DIAZ wrote the majority opinion, in which Judge NIEMEYER joined. Judge WYNN wrote dissenting opinion.
DIAZ, Circuit Judge:
This appeal arises from two desegregation orders entered in 1970 by the United States District Court for the Eastern District of North Carolina. The district court determined then that the Greenville City and Pitt County Boards of Education were operating racially segregated schools and directed them to submit desegregation plans that would establish a nonracial, unitary school district. Following the school boards’ initial compliance with the orders, the cases were administratively closed and lay dormant for over thirty-five years.
In 2008, a dispute arose between the Pitt County Board of Education (the “Board”)[1] and the Greenville Parents Association (the “Association”) concerning the Board’s explicit consideration of race when devising student assignment plans. The parties ultimately settled, and the district court entered a consent order approving the settlement and directing the parties to work together toward attaining unitary status for the school district.
Three years later, a group of parents and the Pitt County Coalition for'Educating Black Children (“Plaintiffs”) moved to enjoin the implementation of the Board’s 2011-12 student assignment plan, arguing that it failed to move the school district toward unitary status. The district court denied relief, but we vacated that ruling, holding that the district court erred when it failed to place the burden on the Board to show that the 2011-12 student assignment plan moved the school district toward unitary status. On remand, the Board filed a motion requesting that the district court declare the school district unitary. After a five-day bench trial, the district court granted the Board’s motion and dismissed Plaintiffs’ request for an injunction as moot.
We conclude that the district court acted within its discretion in choosing to address the Board’s motion for declaration of unitary status before ruling on Plaintiffs’ motion for injunctive relief. And because the court did not clearly err in determining that the school district is unitary, we affirm.
*137 I.
A.
In January 1965, a group of plaintiffs representing black students filed suit against the Pitt County Board of Education, alleging that the board unlawfully operated and maintained racially segregated schools. Teel v. Pitt County Board of Education, No. 6:65-CV-569 (E.D.N.C. filed Jan. 4, 1965). The district court entered an injunction restraining the Board from refusing admission, assignment, or transfer of any student on the basis of race. The Board attempted to comply with the court order by adopting a freedom-of-ehoice plan, which allowed students to choose the school they wished to attend. The plan, however, resulted in only a small percentage of black students attending predominantly white schools. As a result, the district court rejected it, ruling that it failed to advance the Board’s constitutional duty to establish a unitary school district. It took several more years for the Board to devise a desegregation plan that met with the district court’s approval.
A separate but substantially similar action came before the district court in November 1969. Like Teel, Edwards v. Greenville City Board of Education, No. 6:69-CV-702 (E.D.N.C. filed Nov. 12 1969), involved representatives of black students asking the district court to enjoin the Greenville City school board’s continued operation of a racially segregated school system. Again, the district court granted the injunction. The court rejected the board’s first proposed desegregation plan and ordered it to submit a plan that achieved racial integration in not only student assignment, but also faculty and staff assignment, extracurricular activities, and transportation. Shortly thereafter, the board submitted an amended plan that met with both the plaintiffs’ and the court’s approval.
The district court continued to monitor the progress of the desegregation plans until January 1972, when it issued orders determining that the cases had been decided on the merits and removed them from the pending docket, subject to being reopened as circumstances warranted. The cases remained administratively closed for thirty-five years. In the meantime, the two school districts merged in 1986 and their separate boards of education were replaced by a single, consolidated Board.
The consolidated Board sought to reopen Teel and Edwards in 2008. The impetus was the Board’s adoption, three years earlier, of a new student assignment plan for the 2006-07 academic year.[2] Under the then-existing attendance area policy, the assignment plan considered students’ race, with the goal of achieving a 70/30[3] racial balance in each school. To achieve this balance, the new plan relied on satellite attendance areas[4] and busing.
Objecting to the explicit use of race in student assignment, the Association filed a discrimination complaint with the United States Department of Education Office for Civil Rights (the “OCR”). While the complaint was pending, the Board revised its *138 attendance area policy, adding student achievement and socioeconomic status as factors that, along with race, the Board would consider when establishing student attendance areas.
Ultimately, the Board and the OCR settled the complaint. The settlement required the school district to seek a ruling from the district court as to whether the desegregation orders in Teel and Edwards authorized the Board to consider race in its student assignment plan. In accordance with the settlement, the Board asked the district court to approve its 2006-07 student assignment plan as well as its revised attendance area policy.
In response, the district court reopened . and consolidated Teel and Edwards and re-captioned the new action under its current name. In addition, the court allowed the Association to intervene. The Association then asked the district court to reject both the 2006-07 student assignment plan and the revised attendance area policy, and instead declare the school district unitary. Plaintiffs joined the Board in opposing the motion.
After court-ordered mediation, the parties reached a settlement. The Board agreed to involve Plaintiffs and the Association in developing the next student assignment plan. In exchange, the Association withdrew its motion for a declaration of unitary status, and consented to the Board’s motion for approval of the 2006-07 student assignment plan and the revised attendance area policy. The parties also “pledge[d] to work together to achieve” unitary status for the school district. J.A. 195.
The district court approved the settlement and entered a consent order in November 2009. The court’s order directed “the parties to work toward attaining unitary status so that the court may relinquish jurisdiction over this case and restore to the School Board foil responsibility for the operation of its schools.” J.A. 204.
B.
In 2010, the Board began developing a student assignment plan for the 2011-12 school year to accommodate the opening of a new elementary school and the closing of an existing one. The Board worked with the Operations Research and Education Laboratory of North Carolina State University (“OREd”)[5] to draw up proposed attendance area maps. In designing the maps, the Board and OREd considered: (1) students’ proximity to their assigned schools; (2) building capacity; (3) academic proficiency; and (4) impact area[6]. Notably, academic proficiency was the sole diversity input factor the Board used when designing the maps, even though the Board’s attendance area policy permitted it to consider student race.
The Board invited the Association and Plaintiffs to attend two workshop retreats to solicit their input regarding the proposed maps. During the first retreat, the Board presented two proposals. The first proposed map considered only student proximity and school capacity in developing attendance boundaries (“Scenario 1”). This map resulted in an increase in racially identifiable schools, with six impacted schools falling short of the Board’s target *139 student proficiency index. The second proposed map factored in student proficiency along with proximity and school capacity (“Scenario 2”). It resulted in increased student diversity, and a greater balance of student proficiency levels across the impacted schools. Scenario 2, unlike Scenario 1, required the use of satellite attendance areas and busing.
After receiving input from the parties, the Board directed OREd to generate a new map. This map (“Scenario 3”) aimed to limit satellite attendance areas, but still considered student proficiency in an attempt to increase diversity. The proposed map was then further modified based on community input. The final Scenario 3 map resulted in schools that were more racially diverse than in Scenario 1, but less diverse than Scenario 2. It also required fewer satellite attendance areas than Scenario 2. ■ Over Plaintiffs’ objections, the Board adopted the Scenario 3 map as its 2011-12 student assignment plan.
Plaintiffs moved to enjoin the implementation of the 2011-12 plan, arguing that it created racially identifiable schools and failed to move the district toward unitary status. The district court denied the motion, ruling that Plaintiffs “ha[d] not demonstrated a likelihood of success on the merits of their claim so as to justify the extraordinary relief they request[ed].” Everett v. Juvenile Female 1, No. 6:69-CV-702-H, 2011 WL 3606539, at *2 (E.D.N.C. Aug. 16, 2011).
On appeal, we vacated the district court’s ruling and remanded. We found that:
Given that there is no dispute that the school district has not attained unitary status, the evidentiary burden should have been on the School Board to prove that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board’s affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.
Everett v. Pitt Cnty. Bd. of Educ., 678 F.3d 281, 290 (4th Cir.2012).
When the case returned to the district court, the Board moved for a declaration of unitary status. After a five-day bench trial, the district court ruled for the Board. It found that, even before the 1986 merger, both Pitt County and Greenville City schools were unitary with respect to student assignment. The court also found that the consolidated school district was now unitary in terms of faculty and staff assignment, facilities, transportation, and extracurricular activities.
The Board, said the district court, had proven that “the vestiges of state-mandated discrimination practiced over forty years ago have been eliminated to the extent practicable and that the School Board, as well as its predecessor boards, has complied in good faith with this court’s desegregation orders.” Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 42 (E.D.N.C. Sept. 25, 2013). Because the school district was unitary in all respects, the court denied Plaintiffs’ motion for injunctive relief as moot. This appeal followed.
II.
A.
In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Broum I), the Supreme Court held that laws mandating racial segregation in public schools violate the Equal Protection Clause of the Fourteenth Amendment. A year later, the Court ordered those school boards operating racially segregated school systems to “effectuate a transition to a racially nondiscriminatory school sys- *140 tern.” Brown v. Bd. of Educ., 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (.Brown II). The federal district courts were tasked with undertaking “such proceedings and entering] such orders and decrees” as necessary to desegregate school districts with “all deliberate speed.” Id.
Thirteen years later, the Court clarified that the “transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about” by Brown II. Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430, 436, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). School boards operating “dual systems,” whereby black children attend black schools and white children attend white schools, retained “the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.” Id. at 437-38, 88 S.Ct. 1689.
Generally, courts “have used the terms ‘dual’ to denote a school system which has engaged in intentional segregation of students by race, and ‘unitary' to describe a school system which has been brought into compliance with the command of the Constitution.” Bd. of Educ. of Okla. City Pub. Schs. v. Dowell, 498 U.S. 237, 246, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). However, the Supreme Court has declined to give the term “unitary” a “fixed meaning or content.” Freeman v. Pitts, 503 U.S. 467, 487, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Rather, the Court has left it to district courts overseeing the desegregation process to determine when a school district “no longer discriminates between children on the basis of race.” Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 318 (4th Cir.2001).
In making this determination, a district court considers. “whether the Board [has] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination [have] been eliminated to the extent practicable.” Dowell, 498 U.S. at 249-50, 111 S.Ct. 630. Only when it is satisfied that a school district is operating a unitary system may the court dissolve a desegregation order, thereby relinquishing its supervisory authority over the school district. See id. at 246, 111 S.Ct. 630 (“If [a desegregation] decree is to be terminated or dissolved, respondents as well as the school board are entitled to a like statement from the court.”); Riddick by Riddick v. Sch. Bd. of Norfolk, 784 F.2d 521, 530 (4th Cir.1986) (“[The district court] is required to retain jurisdiction until it determines that the school system has become unitary.”).
The district court’s “end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.” Freeman, 503 U.S. at 489, 112 S.Ct. 1430. Indeed, “Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.” Id. at 490, 112 S.Ct. 1430.
B.
With these principles in mind, we consider the merits of Plaintiffs’ legal challenges. We first address Plaintiffs’ claim that the Board was estopped from seeking a retroactive declaration of unitary status given its “numerous judicial admissions ... that it had not attained unitary status at any time prior to 2009.”[7] Appellant’s Br. at 36. We reject this contention.
*141 A judicial admission is a representation made by a party that, “unless allowed by the court to be withdrawn, is conclusive in the case.” Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 264 (4th Cir.2004) (quoting Keller v. United States, 58 F.3d 1194, 1199 n. 8 (7th Cir.1995)). Judicial admissions “go to matters of fact which, otherwise, would require evidentiary proof.” New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir.1963). In addition, judicial admissions “include intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law.” Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 347 (4th Cir.2014) (internal quotation marks omitted). A purported judicial admission is binding only if the statement is “deliberate, clear, and unambiguous.” Id.
Included among the statements that Plaintiffs rely on as examples of judicial admissions are the Board’s statements in its motion for approval of the 2006-07 student assignment plan and revised attendance area policy that the school district “was permitted to consider racial balance in student assignment under Edwards and Teel,” and could “adopt a racial balance ratio and otherwise ... consider race as a factor” in its student assignment plans. J.A. 90, 93, 95. Plaintiffs also cite the Board’s motion in support of the 2009 consent order in which the Board acknowledged that “the Proposed Consent Order would not dispose of the unitary status issue once and for all.” J.A. 178.
These statements, however, merely acknowledged the judicial reality on the ground, i.e. that the school district remained subject to the district court’s desegregation orders until the court declared the schools unitary. They fall far short of deliberate, clear, and unambiguous admissions that the Board continued to operate a dual school district.
In any event, Plaintiffs’ contention suffers from a more fundamental flaw. Simply put, whether a school district is unitary is not something that can be judicially admitted (or denied); rather, it is entirely the province of the district court to decide the issue. This conclusion is compelled by our decision in Belk.
There, the school board insisted to the district court that it “had not pursued the dismantlement of the dual system with the requisite zeal.” Belk, 269 F.3d at 333. The court nonetheless declined to defer to the board’s claim that its school district was not unitary. Indeed, it highlighted several reasons why the board might have wanted to remain subject to the desegregation orders, including avoiding the “long, drawn-out process” and expense involved with a unitary status hearing, fears that it might lose eligibility for certain federal funding should it be declared unitary, and a desire to continue racially balancing its schools. Id. We approved of the district court’s finding on this issue, concluding that a school board’s representation that it *142 is not unitary may reflect the self-interested desire of a board to use a desegregation order as a “mechanism[ ] for the attainment of different goals.” Id. at 334.
Consequently, even if the Board in this case had admitted that it continued to operate a dual school district, the district court was under no obligation to treat the Board’s statements as conclusive in deciding whether the school district was unitary.
C.
Plaintiffs next contend that the district court violated the “law of the case” by considering the unitary status question before first deciding whether the 2011-12 student assignment plan moved the school district toward that status. The law of the case doctrine “posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.” Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Once a court has established the law of the case,
it -must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal ... unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.
United States v. Aramony, 166 F.3d 655, 661 (4th Cir.1999) (internal quotation marks omitted). Because we find the first exception applicable here, we reject Plaintiffs’ contention.
According to Plaintiffs, we established the law of the case during the first appeal when we directed the district court to place the evidentiary burden on the Board “to prove that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board’s affirmative duty to. eliminate the vestiges of discrimination and move toward unitary status.” Everett, 678 F.3d at 290. Plaintiffs say that the district court’s finding that the school district was already unitary at the time of the implementation of the 2011-12 student assignment plan effectively ignores our prior holding.
When we first considered this case, however, the only issue decided by the district court was whether the 2011-12 student assignment plan was consistent with the Board’s obligation to work toward attaining unitary status. On remand, the Board moved for just such a declaration. In response, the district court held a trial during which the parties, for the first time, presented evidence on that issue. Once the district court took evidence on the question, it was no longer bound by the law of the case, but was instead free to determine whether the school district was unitary. Accordingly, we find no error in the manner in which the district court elected to address the issues before it.
D.
We turn now to the heart of Plaintiffs’ challenge to the process by which the district court resolved this case. In essence, Plaintiffs contend that the Board first had to prove that the 2011-12 student assignment plan moved the school district toward unitary status before the district court -could declare the schools unitary. Plaintiffs say that by flipping the issues— that is, by first declaring the schools unitary and then refusing, on mootness grounds, to assess the merits of 2011-12 student assignment plan — the district *143 court improperly gave the unitary status determination retroactive effect. We do not agree.
1.
Plaintiffs contend that a declaration of unitary status is effective only as of the date it is issued. Therefore, until September 25, 2013 (the date of the district court’s order declaring the school district unitary), any Board action had to be consistent with its obligations under the desegregation orders, and the later 2009 consent order. By deciding the unitary status issue before evaluating the 2011-12 student assignment plan, Plaintiffs say that the district court made an unlawful retroactive declaration of unitary status.
It is of course true that, until declared unitary, a school district retains a continuing duty to work toward eliminating the vestiges of its past discrimination. Riddick, 784 F.2d at 535; Vaughns by Vaughns v. Bd. of Educ. of Prince George’s Cnty., 758 F.2d 983, 988 (4th Cir.1985) (“Until a school system has discharged its duty to liquidate the dual system and replace it with a unitary one, the school’s duty remains in place.”). Whether a school district has eliminated the vestiges of discrimination is judged against what are known as the Green factors. See Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Under Green, “a school district has achieved unitary status when it is devoid of racial discrimination in regard to faculty, staff, transportation, extracurricular activities, facilities, and pupil assignment.” Sch. Bd. of Richmond v. Baliles, 829 F.2d 1308, 1312 (4th Cir.1987).
A dual school district operates under a presumption “that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the [school board].” Id. at 1311. That presumption, however, ends when the school has achieved unitary status, at which point the burden of proof shifts back to the plaintiffs, “to prove discriminatory intent on the part of the school board of a unitary school [district].” Riddick, 784 F.2d at 537.
Importantly, the burden of proof shifts, not when the school district is declared unitary, but when the district court determines it first achieved that status. This proposition is exemplified by our decision in School Board of Richmond v. Baliles. In that case, after a court-ordered freedom-of-choice plan proved unsuccessful, the district court ordered the School Board of the City of Richmond to implement a desegregation plan that “required extensive busing of students, proximal geographic zoning, pairing, clustering, satellites and racial balance among faculty.” Bradley v. Baliles, 639 F.Supp. 680, 682 (E.D.Va.1986).
Twelve years later, the board came before the district court asking to be realigned as plaintiffs and to have certain state officials, including the Governor of Virginia, joined as defendants. It argued that Virginia had “engaged in various activities which contributed to the segregation that existed in” Richmond Public Schools. Id. Consequently, the board “sought to compel the state to fund remedial and compensatory programs to eliminate the lingering effects of the state’s former dual system.” Baliles, 829 F.2d at 1310.
The district court found that Richmond Public Schools had achieved unitary status sometime between 1972 and 1986. Bradley, 639 F.Supp. at 687. Because the school district had become unitary, the court concluded that the burden had shifted to the board to prove that any vestiges of past state-mandated segregation re *144 mained in Richmond Public Schools. Id. at 689. The court then proceeded to address and deny the board’s request for relief.
On appeal, we affirmed the district court’s shifting of the burden. Baliles, 829 F.2d at 1312. Thus, Baliles demonstrates that a district court may assess unitary status before addressing the request for relief that brought the plaintiff before the court in the first place. This is true, even though the declaration may weaken (or even eliminate) the plaintiffs claim for relief.
The only authority that Plaintiffs cite in support of their claim that a unitary status determination cannot relate back is Capacchione v. Charlotte-Mecklenburg Schools, 57 F.Supp.2d 228, 285 (W.D.N.C.1999), aff'd in part, rev’d in part by Belk, 269 F.3d 305. There, the district court stated that “the termination of court supervision today cannot ‘relate back’ to an earlier time.” Id. However, in context, that statement was part of a larger discussion on whether school officials acting pursuant to a court’s desegregation order enjoyed immunity from damages. Indeed, the court held that the school district “was still under court order [and there was] no legal basis for a finding of de facto unitary status that would abrogate [the district’s] immunity retroactively.” Id.
This, of course, must be the case given the “well-established insistence that those who are subject to the commands of an injunctive order must obey those commands.” Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 439, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). It follows that school officials, acting pursuant to their obligations under a desegregation order, cannot be held liable for damages on account of those actions. However, Capacchione has little relevance here, where the court’s “retroactive” unitary status declaration merely shifts the burden of proving discriminatory intent.
2.
The district court’s decision to assess unitary status first comports with its obligation to “restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.” Freeman, 503 U.S. at 489, 112 S.Ct. 1430. The Supreme Court has repeatedly emphasized that district court supervision is a “temporary measure.” Id.; Dowell, 498 U.S. at 247, 111 S.Ct. 630; see also Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (“[O]ur cases have ... firmly recognized that local autonomy of school districts is a vital national tradition.”); Milliken v. Bradley, 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (“No single tradition in public education is more deeply rooted than local control over the operation of schools.... ”). It would be anathema to the goal of quickly and efficiently returning a school district to local control if the district court were required to ignore its conviction that the Pitt County school district is unitary, and instead analyze the 2011-12 student assignment plan through a prism of state-mandated segregation that no longer exists.
We recognize that the district court declined altogether to entertain Plaintiffs’ request for injunctive relief, finding that “an order enjoining the continued implementation of this plan would be pointless since the school district has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district toward unitary status.” Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 40-41 (E.D.N.C. Sept. 25, 2013). Still, if Plaintiffs had made credible allegations that the Board was taking intentionally segregative actions, an injunction *145 should nonetheless issue. But here, Plaintiffs’ request to enjoin the 2011-12 student assignment plan depends entirely on their allegation that the plan “moves the district further from unitary status.” J.A. 214. Because the district court held that the school district was unitary at the time of the plan’s implementation (and has remained so), it did not err in dismissing Plaintiffs’ motion for injunctive relief as moot.
III.
A.
Having determined that the district court did not err in the manner in which it addressed the issues before it, we now reach the merits of its finding that the school district is unitary. We review this determination for clear error. Belk, 269 F.3d at 317. “A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed.” Id. at 317-18 (quoting Faulconer v. Comm’r, 748 F.2d 890, 895 (4th Cir.1984)). We may not overturn the district court so long as its “unitary status determination rests on a permissible view of the evidence,” even if we might have ruled differently had we been sitting as the trier of fact. Id. If the “district court’s account of the evidence is plausible in light of the record viewed in its entirety,” then we must affirm. Id. at 319 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).
The test for determining whether a school district is unitary is twofold. The district court must find that the school district has “complied in good faith with the desegregation decree since it was entered,” and it must be satisfied that “the vestiges of past discrimination [have] been eliminated to the extent practicable.” Dowell, 498 U.S. at 249-50, 111 S.Ct. 630. We have said previously that “[implicit in the ... térm ‘practicable’ is ‘a reasonable limit on the duration of federal supervision.’ ” Belk, 269 F.3d at 318 (quoting Coal, to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 760 (3d Cir.1996)) (alteration omitted).
When deciding whether a school district has eliminated the vestiges of past discrimination, the district court considers the six Green factors: student assignment, faculty assignment, staff assignment, transportation, extracurricular activities, and facilities. See Belk, 269 F.3d at 318-19 (citing Green, 391 U.S. at 435, 88 S.Ct. 1689). In addition, the court has discretion to consider other factors not listed in Green. Freeman, 503 U.S. at 492-93, 112 S.Ct. 1430.
Before a school district is declared unitary, there is a presumption that racial disparities in any of the Green factors are traceable to segregation. Baliles, 829 F.2d at 1311. However, that presumption is overcome when a school district demonstrates that racial disparities are a result, not of its present or past discrimination, but rather external factors, such as demographic changes, beyond the district’s control. Missouri v. Jenkins, 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); see also NAACP v. Duval Cnty. Sch., 273 F.3d 960, 966 (11th Cir.2001). Moreover, “with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish.” Freeman, 503 U.S. at 491, 112 S.Ct. 1430.
As we explain below, we find that the district court did not clearly err in *146 finding that the school district has eliminated the vestiges of its past discrimination.
B.
1.
The first and “perhaps the most critical Green factor” is whether there remains any racial disparity in student assignment. See Belk, 269 F.3d at 319. When analyzing racial imbalances in student assignment, district courts generally compare the variance between an individual school’s ratio of black students to white students to a broader measure of the entire school district’s population of black students and white students. See id.
The parties called competing expert witnesses to testify as to the Board’s efforts to eliminate racial disparity in student assignment. The Board’s witness, Dr. David Armor, reviewed student enrollment data for the Pitt County schools (and the Greenville City schools, pre-merger) from 1968 to 2011.[8] To determine whether the schools were racially balanced post-merger, Dr. Armor applied a plus-or-minus 20% variance comparing the percentage of black students at a particular school to the percentage of black students enrolled at that grade level (i.e., K-5, 6-8, 9-12). Pre-merger, Dr. Armor compared the percentage of black students at a particular school to the overall percentage of black students enrolled in the school district.
Dr. Armor found that, pre-merger, the school boards were successfully able to desegregate their schools and maintain racial balance. He thus concluded that the school district was unitary with respect to student assignment, even before the merger. Following the merger, Pitt County saw substantial population growth with attendant demographic changes. Even so, Dr. Armor found that twenty-six of the thirty-seven schools in the district were racially balanced for twenty or more years, and were also balanced as of the 2011-12 school year.
On the other hand, Plaintiffs’ student assignment expert, Dr. Genevieve Siegel-Hawley, applied a plus-or-minus 15% variance in comparing the share of black or white students at a particular school to the district-wide share of black or white students.[9] She found that, since 1987, an average of eight schools were racially imbalanced each year. By 2011, fourteen schools were racially imbalanced. Since 2001, three new schools were built that opened with a racial imbalance.
Overall, Dr. Siegel-Hawley concluded that “[downturns in levels of racial imbalance were quickly followed by increases, indicating that [the school district] did not sustain an effective desegregation program for more than a year.” J.A. 656. Indeed, she testified that the 2011-12 student assignment plan resulted in a post-merger high of 40% of students attending a racially imbalanced school. Thus, according to Dr. Siegel-Hawley, the Board had failed to eliminate the vestiges of past discrimination in regard to student assignment.
The district court adopted Dr. Armor’s metrics and relied primarily on his analy *147 sis in finding the school district unitary with respect to student assignment. First, it found that Dr. Armor’s use of a plus-or-minus 20% variance was reasonable. While we have previously specifically approved the plus-or-minus 15% variance that Dr. Siegel-Hawley applied, we have also noted approvingly that higher variances have been used by other courts. See Belk, 269 F.3d at 319 (citing the plus-or-minus 20% variance used in Manning v. Hillsborough County School Board, 244 F.3d 927, 935 (11th Cir.2001)).
Moreover, the district court found that Dr. Armor’s comparison (post-merger) of an individual school’s racial composition to the student population of that particular grade level was a superior metric to Dr. Siegel-Hawley’s comparison to the student population of the school district as a whole. The court agreed with Dr. Armor “that the racial composition of students attending elementary schools within a particular district may be far different from the racial composition of that district’s high schools.” Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 14 (E.D.N.C. Sept. 25, 2013).
We believe that the district court’s decision to rely on Dr. Armor’s report and testimony was not clearly erroneous. See FTC v. Ross, 743 F.3d 886, 894 (4th Cir.2014) (“In cases in which a district court’s factual findings ton on ... the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference.” (internal quotation marks omitted)). And we agree with the district court that, to the extent that racial imbalance remains an issue in the school district, there is substantial evidence indicating that it was caused by white students either leaving the public school system, or moving to more racially segregated neighborhoods.
The Supreme Court has been clear that school districts need not take affirmative measures to correct racial imbalances caused by demographic changes once they have remedied the effects of prior de jure segregation. Freeman, 503 U.S. at 494, 112 S.Ct. 1430 (“Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.”); Swann, 402 U.S. at 31-32, 91 S.Ct. 1267. Moreover, “[t]he continued existence of a small number of one race schools within ... a school district does not establish in and of itself a constitutional violation.” Riddick, 784 F.2d at 535.
Here, the most striking instance of “white flight” came in response to the Board’s aggressive 2006-07 student assignment plan, which “used satellite school [attendance areas] and racial balancing ratios in an effort to reduce the racial isolation of elementary schools in the former Greenville City school district.” J.A. 201. The implementation of that plan ultimately resulted in a significant decline in the white student population, much of which left the impacted schools for private schools, home schooling, or other schools in the County.
While the Board was under no duty to implement intensive desegregation efforts given that many of the remaining racially identifiable schools were a consequence of demographic shifts within Greenville, its failed efforts at bringing greater racial balance to Greenville City schools illustrate that any remaining segregation in the school district is a consequence of outside forces that cannot properly be attributed to the Board’s prior discriminatory acts. We therefore find no clear error in the district court’s finding that the school district is unitary with respect to student assignment.
*148 2.
Next, .we consider two Green factors together, faculty and staff assignment. Here, all of the Board’s data comes from 2004 and later. Dr. Armor employed a variance of plus-or-minus 10% to compare the number of black faculty and staff at an individual school with the districtwide percentage of black faculty and staff.[10] He found that, since 2004, thirty-one out of thirty-six schools maintained racial balance in faculty and staff, or were only slightly imbalanced for one or two years.
Furthermore, Dr. Armor testified that nearly all of the schools during that time had a racially mixed administrative staff. In addition, the former district superintendent testified that she specifically considered the diversity that a candidate for a vacant principal or assistant principal position could offer to the school. The Board also introduced evidence showing the efforts the district has made to recruit minority teachers. In short, the district court had sufficient evidence before it to conclude that the Board undertook diligent efforts that ultimately resulted in a racially diverse faculty and administrative staff at its schools.
3.
The next Green factor we consider is the Board’s maintenance and provision of adequate school facilities. Plaintiffs do not say that the school district is not unitary with respect to quality of facilities. Rather, they claim that the Board failed to prove that siting decisions are made consistently with the Board’s obligation to eliminate the vestiges of past discrimination. The district court disagreed, and we believe that it did not clearly err.
The Board uses a Long Range Facility Plan to “strategically locate schools where residential growth is anticipated.” J.A. 1029. It determines when improvements or new construction are necessary based on the overall needs of the individual school and the school district in general. Since 1990, the district has worked with OREd to determine where to locate new schools. OREd uses a computer model that determines the “optimal location for a new site that will relieve the current crowding and provide room for anticipated growth.” J.A. 2402. The Board’s evidence adequately demonstrates that new schools are sited according to the needs of the district overall, and that the Board works with OREd in a race-neutral manner to make siting decisions.
4.
We also discern no error in the district court’s finding -that the school district is ’ unitary with respect to transportation. The school district provides bus service to all eligible students. Students qualify for bus transportation, regardless of race, based on the distance between their residences and their assigned schools. Moreover, travel times are actually longer for white and Hispanic students than for black students. Thus, we find no basis for questioning the district court’s view that students receive transportation to school on a racially nondiscriminatory basis.
5.
Finally, the district court did not clearly err in concluding that the school district is unitary with respect to extracurricular activities. The Board’s evidence showed that such activities are available in all schools, and there are no race-based barriers to *149 participation. Moreover, students throughout the district are adequately informed about the availability of extracurricular activities. Nor are there financial barriers to participation. We think the Board’s evidence was sufficient for the district court to conclude that the district is unitary with respect to this final Green factor.[11]
C.
Our analysis of the Board’s efforts to eliminate the vestiges of past discrimination to the extent practicable satisfies us that the district court did not clearly err in also finding that the Board has complied in good faith with the Teel and Edwards desegregation orders. A school district can demonstrate its good faith compliance by showing its “commitment to a constitutional course of action [in which] its policies form a consistent pattern of lawful conduct directed to elimi-' nating earlier violations.” Freeman, 503 U.S. at 491, 112 S.Ct. 1430. We agree with the district court that the Board has demonstrated commendable good faith in complying with the desegregation orders.
Indeed, we need look no further for proof than the fact that the desegregation orders remained administratively closed for over thirty-five years, during which time the Board undertook the task of integrating the schools relatively undisturbed. Until 2008, no party came before the district court accusing the Board of neglecting or disregarding its obligations under the desegregation orders. And when this ease was reopened, it was as a consequence of a dispute regarding the 2006-07 student assignment plan in which certain parents essentially argued that the Board went too far in its efforts to desegregate the schools. Moreover, in the proceedings leading up to the district court’s 2009 consent order, Plaintiffs and the Board were both aligned in opposition to the Association’s motion for declaration of unitary status.
From the date the district court entered its desegregation orders, school administrators took immediate steps to effectively ■integrate their schools and move them toward unitary status. In very short order, both school districts had almost completely eliminated racially identifiable schools. While racial imbalance returned over the succeeding years, the respective boards consistently took measures to bring their schools back into balance.
Post-merger, the consolidated Board used satellite attendance area's and busing to maintain racial balance. When demographic factors caused an increase in racially identifiable schools, the Board took reasonable steps to restore balance. Ultimately, a substantial number of schools were able to achieve racial balance, and maintain it as of the 2011-12 school year. In short, we are convinced that the Board has acted in good faith since the entry of the desegregation orders in 1970. We therefore conclude that the district court did not clearly err in finding that the Board satisfied this prong of the unitary status inquiry.
IV.
In sum, the district court did not err by first determining that the Pitt County school district is unitary, and then denying Plaintiffs’ motion to enjoin the 2011-12 *150 student assignment plan as moot. And because the district court did not clearly err in finding that the school district is in fact unitary, the judgment of the district court is

AFFIRMED.

. By this date, the Greenville City and Pitt County schools had been consolidated into a single school district.

. Only schools within the Greenville city limits were subject to the 2006-07 student assignment plan.

. By 70/30 racial balance, the Board intended no school to have more than a seventy percent white or black population and no less than a thirty percent black or white population.

.Satellite attendance areas are created by attaching "relatively homogenous neighborhoods of mostly one race” to "non-contiguous school zones some distance away that need[ ] that race for racial balance.” J.A. 802.

. OREd “is a non-profit organization that provides school districts with scientific tools to project future enrollment, to evaluate utilization of existing school facilities, to locate placement of new schools, and to develop attendance boundaries.” J.A. 492.

. Impact area refers to the location and number of school attendance areas affected by the reassignment plan.

. Plaintiffs and the dissent assert (incorrectly) that the district court determined that the *141 school district was unitary as of the mid-1980s. In fact, the court found that the two then-separate districts were unitary only as to student assignment, see Everett v. Pitt Cnty. Bd. of Educ., No. 6:69-CV-702-H, slip op. at 20, 23 (E.D.N.C. Sept. 25, 2013), which was not sufficient to support a declaration of unitary status. The court implicitly recognized this fact, as it went on to conclude that the school district remained unitary with respect to student assignment after the merger, and then conducted a thorough examination of the remaining Green factors. Yet, by determining that Plaintiffs’ motion to enjoin the 2011-12 student assignment plan was moot, the district court necessarily found — even if it did not say so expressly — that the school district was unitary at the time of the implementation of the 2011-12 plan. As we explain, however, we do not think this problematic.

. For the years 1968 to 1984, Dr. Armor only had access to student enrollment data for even-numbered years. We do not believe that Dr. Armor’s lack of data for odd-numbered years substantially undermines the credibility of his testimony and report. We also note that Plaintiffs’ expert relied on this same data for her analysis.

. Before the merger, Dr. Siegel-Hawley compared the white population of an individual school to the white population of the entire school district. Post-merger, Dr. Siegel-Hawley compared the black population of an individual school to that of the entire school district.

. Plaintiffs argue that there was no basis for Dr. Armor’s use of the plus-or-minus 10% variance. We have, however, previously approved the use of an even greater variance— plus-or-minus 15% — with respect to faculty assignment. Belk, 269 F.3d at 326.

. Despite Plaintiffs' urging, the district court refused to consider disparity in student discipline as an ancillary factor in addition to the Green factors. We find no abuse of discretion in this decision because there was not sufficient evidence in the record demonstrating that the school district targets black students for discipline or otherwise treats them differently in disciplinary matters. See Belk, 269 F.3d at 332.