**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-4108**

_____

UNITED STATES OF AMERICA,

　　　　Plaintiff – Appellee,

v.

SAMUEL PIERRE JOSEPH,

　　　　Defendant – Appellant.

_____

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Thomas E. Johnston, District Judge. (2:22-cr-00093-1)

_____

Argued: March 18, 2025　　　　　　　　　　　　　　Decided: May 28, 2025

_____

Before HEYTENS and BERNER, Circuit Judges, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Heytens wrote the opinion, which Judge Berner and Judge Gibney joined.

_____

**ARGUED:** Tim Channing Carrico, CARRICO LAW OFFICES, LC, Charleston, West Virginia, for Appellant. Jeremy Bryan Wolfe, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

_____

TOBY HEYTENS, Circuit Judge:

Samuel Joseph was convicted of drug and firearm offenses. On appeal, he challenges the district court's denial of his motion to suppress evidence seized during two encounters with law enforcement. We affirm.

I.

The first encounter took place in Charleston, West Virginia. Because this appeal arises from the denial of a motion to suppress after an evidentiary hearing, we recite the facts as found by the district court and in the light most favorable to the government. See *United States v. Buster*, 26 F.4th 627, 630 (4th Cir. 2022).

A.

After receiving a tip about possible drug activity, a police officer spent more than five hours cumulatively watching the street-facing door of a particular motel room. During that time, the officer only saw one person enter or leave the room: Joseph.

Following an initial four-hour surveillance period, the officer walked up to the motel room door and knocked. No one answered. The room had a bay window with open blinds. Through the window, the officer saw "numerous" "sandwich-style bags," "digital scales," and "folded pieces of paper," items the officer knew were "consistent with drug distribution." JA 87–88. The officer left and then returned several hours later.

About 45 minutes after returning, the officer saw Joseph use a key to enter the room. An hour and twenty minutes later, the officer saw Joseph leave the room carrying a duffel bag and walk across the street to a McDonald's. The officer thought Joseph "was paranoid or checking to see if anybody was watching him" because he was "look[ing] around" and

2

"check[ing] over his shoulders." JA 93. Joseph went inside the McDonald's and began "lingering in the lobby." JA 95.

The officer requested another officer's assistance in "confront[ing]" Joseph. JA 95. As the first officer prepared to enter the McDonald's through one door, Joseph looked at the officer, turned, and left the building through a different door near where the second officer had just arrived. As Joseph exited the building, the second officer "ordered [Joseph] to stop." JA 257 (quotation marks removed).

Joseph did not stop. Instead, he "took off" running "away from the officer" and "threw down his duffel bag." JA 257. "After a short chase," the second officer "caught and handcuffed" Joseph and the officers retrieved the duffel bag. *Id.* Joseph "consented to a pat down," which revealed both a hotel key and "a knife with white powdery residue on it." JA 257–58 (quotation marks removed). Around the same time, one of the officers "felt a pistol through the side" of the duffel bag and allowed a drug-detection dog that was already on the scene to sniff the bag. JA 258. The dog alerted. The officers then obtained a search warrant for the bag, which yielded drugs and firearms.

## B.

Based on the facts recounted above, we see no Fourth Amendment violation. The Fourth Amendment only limits "searches and seizures," U.S. Const. amend. IV, and there was neither a search nor a seizure until Joseph was apprehended. See *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding that a suspect who ran from police officers "was not seized until he was tackled").

That apprehension, of course, was a Fourth Amendment seizure and thus required

3

"reasonable, articulable suspicion that criminal activity [was] afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); see also *Terry v. Ohio*, 392 U.S. 1, 16–20 (1968). By that point, however, the officers had seen items suggesting drug distribution in the motel room Joseph had entered, and witnessed Joseph's "unprovoked flight upon noticing the police." *Wardlow*, 528 U.S. at 124. Far from "mundane acts [spun] into a web of deception," *United States v. Drakeford*, 992 F.3d 255, 265 (4th Cir. 2021) (quotation marks removed), the officers' personal observations here created reasonable suspicion that Joseph was engaged in criminal wrongdoing. See *Wardlow*, 528 U.S. at 124 (describing "[h]eadlong flight" as "the consummate act of evasion" and "suggestive" of "wrongdoing"); *United States v. Williams*, 548 F.3d 311, 316 (4th Cir. 2008) (noting that digital scales are "commonly used in drug distribution"); *United States v. Fisher*, 912 F.2d 728, 731 (4th Cir. 1990) (same for "[b]aggies and baggie corners"). We thus conclude the officers had reasonable suspicion to stop Joseph. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[D]eterminations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.").

To be sure, the presence of reasonable suspicion does not immunize all actions following a stop, and conduct that is "reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. For that reason, courts must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). But here, the officers took permissible actions after the initial seizure that increased rather than dispelled their reasonable suspicions. Right

4

after Joseph was apprehended, the officers found a knife with a white powdery substance on his person during a pat-down to which Joseph had consented and the drug-detection dog alerted to the duffel bag Joseph had been carrying. At that point, the officers had probable cause to arrest Joseph and get a warrant to search the bag, which they promptly did. See *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest . . . is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."); *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993) ("[W]hen a trained narcotics dog alerts to an item, . . . the police have probable cause to arrest.").

## C.

Joseph's contrary arguments fail to persuade. He emphasizes that there are neither photographs nor bodycam footage of either the motel room or his arrest despite a police department policy requiring officers to use body-worn cameras whenever they interact with the public. But it is no more "the province of the Fourth Amendment" to enforce local department policies than it is to enforce state law, see *Virginia v. Moore*, 553 U.S. 164, 178 (2008), and Joseph wisely concedes that neither the lack of bodycam footage nor the underlying policy violations themselves violate the Fourth Amendment, see Oral Arg. 4:12–:42.

No question, the officers' failures to activate their body-worn cameras in violation of departmental policy—and the resulting lack of corroborating evidence—bear on the officers' credibility as witnesses. For that reason, Joseph was entitled to cross-examine the officers about those matters, both at the suppression hearing and at trial. See *United States*

5

*v. Whiting*, 311 F.2d 191, 196 (4th Cir. 1962) ("A witness may be questioned as to past misconduct even as to collateral matters in order to impeach his credibility."). But we review a district court's factual findings after a suppression hearing only for clear error, see *Ornelas*, 517 U.S. at 699, and a district court does not commit clear error every time it credits the testimony of a witness whose credibility has been attacked, see *United States v. Perez*, 30 F.4th 369, 377 (4th Cir. 2022) (disagreeing that a "district court should have discredited [an officer's] entire testimony about [a] stop" just because it "noted [his] impeachment on [a] minor fact"). To the contrary: A factfinder's "choice to believe one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, can virtually never be clear error." *Cooper v. Harris*, 581 U.S. 285, 316 (2017) (quotation marks removed).

Joseph's other arguments fare no better. He first attacks the reliability of the confidential tip that initially brought the first officer to the motel. But we need not consider that issue because we conclude the initial stop can be upheld based on the officers' personal observations at the motel and the McDonald's. Cf. *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004) ("*In cases where an informant's tip supplies part of the basis for reasonable suspicion*, we must ensure that the tip possesses sufficient indicia of reliability." (emphasis added)). The same is true of Joseph's attack on the district court's factual finding that he dropped the duffel bag while running away and thus abandoned the bag for Fourth Amendment purposes. Even if Joseph were right that he never abandoned the bag, the Fourth Amendment would have permitted the officers "to detain the luggage briefly to investigate the circumstances that aroused [their] suspicion." *United States v. Place*, 462

6

U.S. 696, 706 (1983).

Joseph's final argument is that he was arrested—an event requiring probable cause—*before* the drug-detection dog's alert provided that probable cause. True, Joseph was handcuffed before the dog alerted. But this Court has rejected the view that "plac[ing] [a suspect] in handcuffs . . . automatically transform[s] [an] investigatory detention into a custodial arrest requiring probable cause," *United States v. Gist-Davis*, 41 F.4th 259, 265 (4th Cir. 2022), and Joseph develops no case-specific argument that the initial handcuffing here constituted a full-blown custodial arrest. And because the drug-detection dog was already on the scene, there is no indication that Joseph was handcuffed "longer than necessary to verify or dispel the officer's suspicion" that he was engaged in unlawful activity. *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (quotation marks removed).

## II.

Joseph's other arguments stem from a later traffic stop in Parkersburg, West Virginia. We once again recite the facts as found by the district court and in the light most favorable to the government.

## A.

After receiving a tip from a known informant that "an out-of-town drug dealer" was distributing methamphetamine from a particular house, an officer staked out the address. JA 171. The officer saw two people leave the house and get into a rental car with out-of-state plates. The officer followed the car and stopped it after it made a minor moving violation. Joseph was a passenger in the car.

7

While preparing a ticket, the officer called for a drug-detection dog. The dog arrived about 15 minutes later, while the officer was still processing the ticket. The district court found that the 15-minute period reflected certain "impediments" to the stop's timely completion that were out of the officer's control, JA 269, including the driver's lack of identification and a "male pedestrian [who] approached the traffic stop and leaned inside the driver's window to speak with the driver," which "required [the officer] to clear the man from the vehicle for safety," JA 259 (alterations and quotation marks removed). Once the dog arrived, it alerted to the presence of drugs—still "before the citation was finished." JA 260. The officer removed Joseph from the car and recovered a firearm, methamphetamine, and fentanyl.

## B.

Joseph's sole contention on appeal is that the stop was impermissibly prolonged to allow the drug-detection dog to sniff the car. A district court's determination about whether a traffic stop was unduly delayed is a finding of fact that we review for clear error. See *United States v. Gholston*, 1 F.4th 492, 497 (7th Cir. 2021). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Everett v. Pitt Cnty. Bd. of Educ.*, 788 F.3d 132, 145 (4th Cir. 2015) (quotation marks removed). Here too, we see no reversible error.

Joseph argues that the district court committed clear error in finding that "it would have been impossible for [the officer] to complete the citation prior to the arrival of the canine." JA 269. On his telling, audio recordings of the officer's contacts with dispatch

8

show the stop was unreasonably prolonged at two different points, each lasting about a minute and a half. Neither of Joseph's arguments moves the needle.

First, Joseph notes that the audio recordings show an initial call for a drug-detection dog and a separate call one to two minutes later with Joseph's and the driver's information. These recordings, Joseph contends, show that the officer delayed calling in his and the driver's information so that the officer could call for the dog instead. But the district court found that the officer never "stop[ped] performing the necessary tasks related to the traffic violation." JA 269. And that finding is not clearly erroneous given the officer's testimony that he either called for a dog on his way back to his car or when he was "getting information ready to issue a citation." JA 189.

Second, Joseph points out that the officer missed the first call from dispatch stating that both the driver and Joseph had valid licenses and that the officer only learned that information after calling back more than a minute later. Based on the timeline of events, Joseph asserts that it is "likely" that the officer missed the original call because he was on the phone with a Charleston drug task force detective—another activity that was unrelated to the valid purposes of the traffic stop. Joseph Br. 48.

Once again, Joseph's arguments fail to overcome our deferential standard of review. Although the details about the officer's call with the task force detective are not in the record, the officer testified that he made that call while waiting for dispatch to supply information he had requested about Joseph and the driver. Joseph does not explain how the district court clearly erred when it credited that testimony and found that the officer's call with the task force detective occurred during the eight minutes when the officer was "still

9

awaiting the requested information from dispatch." JA 260. Nor does Joseph offer any evidence to discredit the officer's assertion that he missed dispatch's call due to "background" noise rather than because he was engaged in other matters at the time. JA 184–85. So although Joseph's version of events seems consistent with the record, we see no reversible error because the district court's findings are "plausible in light of the record viewed in its entirety." *Everett*, 788 F.3d at 145 (quotation marks removed).

We reiterate that officers must "be reasonably diligent" in completing traffic stops, and may not perform such stops "in a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop." *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) (first quote); *United States v. Hill*, 852 F.3d 377, 384 (4th Cir. 2017) (second quote). But the district court found that is not what happened here, and that finding is not clearly erroneous.[*]

\* \* \*

The judgment is

*AFFIRMED*.

---

[*] Parts of Joseph's argument challenge the officer's motivations for stopping the car in the first place. See, *e.g.*, Joseph Br. 47 ("[T]his was a drug investigation disguised as a traffic stop."). But the Supreme Court has "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved," and "[t]he Fourth Amendment permits an officer to conduct an investigation *unrelated* to the reasons for the traffic stop as long as it does not lengthen the roadside detention." *Whren v. United States*, 517 U.S. 806, 813 (1996) (first quote); *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (alterations and quotation marks removed) (second quote). Because the district court found the officer did not extend the stop beyond the time necessary to cite the driver for a traffic violation, the officer's subjective motivations are irrelevant to the Fourth Amendment analysis.