**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

## No. 15-1093

UNITED STATES ex rel. JON H. OBERG,

        Plaintiff - Appellant,

    v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY,

        Defendant – Appellee,

    and

NELNET, INC.; KENTUCKY HIGHER EDUCATION STUDENT LOAN CORP.; SLM CORPORATION; PANHANDLE PLAINS HIGHER EDUCATION AUTHORITY; BRAZOS GROUP; ARKANSAS STUDENT LOAN AUTHORITY; EDUCATION LOANS INC/SD; SOUTHWEST STUDENT SERVICES CORPORATION; BRAZOS HIGHER EDUCATION SERVICE CORPORATION; BRAZOS HIGHER EDUCATION AUTHORITY, INC.; NELNET EDUCATION LOAN FUNDING, INC.; PANHANDLE-PLAINS MANAGEMENT AND SERVICING CORPORATION; STUDENT LOAN FINANCE CORPORATION; EDUCATION LOANS INC.; VERMONT STUDENT ASSISTANCE CORPORATION,

        Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:07-cv-00960-CMH-JFA)

Argued: May 12, 2015        Decided: October 21, 2015

Before TRAXLER, Chief Judge, and GREGORY and KEENAN, Circuit Judges.

Vacated and remanded by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Gregory and Judge Keenan concurred.

————————————

**ARGUED**: Bert Walter Rein, WILEY REIN LLP, Washington, D.C., for Appellant. Paul D. Clement, BANCROFT PLLC, Washington, D.C., for Appellee. **ON BRIEF**: Michael L. Sturm, Brendan J. Morrissey, Stephen J. Obermeier, WILEY REIN LLP, Washington, D.C., for Appellant. John S. West, Megan C. Rahman, Richmond, Virginia, Christopher G. Browning, Jr., TROUTMAN SANDERS LLP, Raleigh, North Carolina, for Appellee Vermont Student Assistance Corporation; George W. Hicks, Jr., Raymond P. Tolentino, BANCROFT PLLC, Washington, D.C., Joseph P. Esposito, Jill M. deGraffenreid, HUNTON & WILLIAMS LLP, Washington, D.C., Daniel B. Huyett, Neil C. Scur, STEVENS & LEE P.C., Reading, Pennsylvania, for Appellee Pennsylvania Higher Education Assistance Agency.

————————————

TRAXLER, Chief Judge:

The Pennsylvania Higher Education Assistance Agency ("PHEAA"), was established by the Commonwealth of Pennsylvania in 1963 "to improve access to higher education by originating, financing, and guaranteeing student loans." United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg II"), 745 F.3d 131, 135 (4th Cir. 2014). In addition to administering state-funded grant and scholarship programs on behalf of the Commonwealth, PHEAA conducts nationwide lending, servicing, and guaranteeing activities, and it "now constitutes one of the nation's largest providers of student financial aid services." Id. at 138.

Dr. Jon H. Oberg brought this action against PHEAA and other private and state-created student-loan entities under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, alleging that from 2002 through 2006, the defendants fraudulently claimed hundreds of millions of dollars in federal student-loan interest-subsidy payments to which they were not entitled. See Oberg II, 745 F.3d at 135. As this case has proceeded up and down the appeals ladder,[1] the other defendants have settled or

---

[1] See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp. ("Oberg I"), 681 F.3d 575 (4th Cir. 2012); United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg II"), 745 F.3d 131 (4th Cir. 2014).

were dismissed from the case, and PHEAA is now the sole remaining defendant.

The only issue in this appeal is whether PHEAA qualifies as an "arm of the state" or "alter ego" of Pennsylvania such that it cannot be sued under the FCA. See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 787-88 (2000). We conclude that PHEAA is not an arm of Pennsylvania, and we therefore reverse the district court's order granting summary judgment in favor of PHEAA and remand for further proceedings on the merits of Oberg's FCA claims against PHEAA.

I.

The FCA imposes civil liability on "any person" who makes or presents a false claim for payment to the federal government. 31 U.S.C. § 3729(a)(1). Corporations, including municipal corporations like cities and counties, are "persons" under the FCA, see Cook County v. United States ex rel. Chandler, 538 U.S. 119, 126-27, 134 (2003), but states and state agencies are not, see Vermont Agency of Nat. Res., 529 U.S. at 787-88. To determine whether PHEAA falls into the former or the latter category, we apply "the arm-of-the-state analysis used in the Eleventh Amendment context." Oberg II, 745 F.3d at 135. If PHEAA qualifies as an "arm" or "alter ego" of Pennsylvania, then it is not a "person" subject to liability under the FCA. See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan

4

Corp. ("Oberg I"), 681 F.3d 575, 580 (4th Cir. 2012) (internal quotation marks omitted).

We evaluate four non-exclusive factors when considering whether a state-created entity functions as an arm of its creating state:

> (1) whether any judgment against the entity as defendant will be paid by the State . . . ;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

Id. (quoting S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008)).

Although the focus of the first factor is whether the "primary legal liability" for a judgment will fall on the state, Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 428 (1997) (emphasis added), the practical effect on the state treasury of a judgment against the entity must also be considered. "Where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries," Hess v. Port Auth. Trans-Hudson Corp., 513

U.S. 30, 50 (1994) (alteration omitted), the agency will be found to be an arm of the state, see Oberg II, 745 F.3d at 137; Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001).

"[I]f the State treasury will be called upon to pay a judgment against a governmental entity, the [entity is an arm of its creating state], and consideration of any other factor becomes unnecessary." Cash, 242 F.3d at 223. If the state treasury will not be liable for a judgment rendered against the entity, we must consider the remaining factors, which focus on the nature of the relationship between the state and the entity it created. See id. at 224; accord Lee-Thomas v. Prince George's Cty. Pub. Sch., 666 F.3d 244, 248 n.5 (4th Cir. 2012).

The purpose of the arm-of-state inquiry is to distinguish arms or alter egos of the state from "mere political subdivisions of [the] State such as counties or municipalities," which, though created by the state, operate independently and do not share the state's immunity. Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002); see Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) ("The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not

6

extend."). Although we must consider "the provisions of state law that define the agency's character," Regents, 519 U.S. at 429 n.5, "[u]ltimately . . . , the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore one of the United States within the meaning of the Eleventh Amendment, is a question of federal law," id. (internal quotation marks omitted).

In our first opinion in this case, we held that the district court erred by concluding that PHEAA was a state agency and dismissing Oberg's complaint without applying the arm-of-state analysis. See Oberg I, 681 F.3d at 581. On remand, the district court applied the arm-of-state analysis and again granted the motion to dismiss, concluding that PHEAA was not a person within the meaning of the FCA.

Oberg again appealed, and we again held that the district court erred by dismissing the claims against PHEAA. See Oberg II, 745 F.3d at 140-41. Considering the arm-of-state issue in light of the statutes governing PHEAA's operation and the facts alleged in Oberg's complaint, we held in Oberg II that Oberg had plausibly alleged that PHEAA was not an arm of the state but was instead a "person" subject to suit under the FCA. See id.

We first concluded that Pennsylvania was "neither legally nor functionally liable for any judgment against PHEAA." Id. at

7

138. PHEAA was not legally liable because "state law expressly provides that obligations of PHEAA shall <u>not</u> be binding on the State," <u>id.</u> (internal alterations omitted), and requires PHEAA's debts to be paid from "'moneys . . . of the corporation,'" <u>id.</u> (quoting 24 Pa. Stat. § 5104(3)). As to practical or functional liability, PHEAA argued that Pennsylvania was functionally liable for a judgment against PHEAA because Pennsylvania statutes require PHEAA to deposit its commercially generated revenues with the state Treasury and require the Treasurer's approval of any payment from state Treasury funds. We rejected that argument, however, given that the statute requiring the deposit also explicitly granted control over those funds to PHEAA, not the Treasurer, and the funds were held in a segregated account within the Treasury. <u>See</u> <u>id.</u> at 138-39. Because PHEAA had control over "substantial 'moneys' [that] derive exclusively from its own operations," <u>id.</u> at 138, "any judgment in this case [would be paid] with [PHEAA's] own moneys from its segregated fund," <u>id.</u> at 139, and we therefore concluded that Pennsylvania would not be functionally liable for any judgment against PHEAA. And because there was no functional or legal liability, we held that the first arm-of-state factor weighed "heavily against holding that PHEAA is an arm of the state." <u>Id.</u>

8

As to the second arm-of-state factor, we noted that the indicia of autonomy reflected in the statutory framework and the facts alleged in the complaint pointed in both directions.  The composition of PHEAA's board (gubernatorial appointees and state legislators) weighed in favor of arm-of-state status, as did the statutory requirement that the Governor approve any PHEAA bond issues and the fact that PHEAA's activities were subject to audit by the Commonwealth Auditor General.  See id. at 139.  Nonetheless, other facts "strongly suggest[ed] that PHEAA is not an arm of the state," including PHEAA's financial independence, its control over its revenues deposited with the state Treasury, and its corporate powers "to enter into contracts, sue and be sued, and purchase and sell property in its own name."  Id.  Drawing all inferences from these facts in Oberg's favor, as required given the procedural posture of the case, we concluded that the autonomy factor "counsels against holding that PHEAA is an arm of the state."  Id.

As to the third arm-of-state factor, we held it weighed in favor of arm-of-state status because PHEAA was focused on improving access to higher education, a matter of "legitimate state concern."  Id. at 140.  We rejected Oberg's  argument that PHEAA was not primarily focused on state concerns, given PHEAA's extensive  out-of-state  commercial  activities.  Noting  the allegation in Oberg's complaint that one third of PHEAA's 2005

earnings came from out-of-state activities, we held that "it does not seem plausible that by 2006 -- the last year encompassed by Dr. Oberg's allegations -- PHEAA's operations focused primarily out of state." Id. And as to the fourth factor, we concluded that state law treated PHEAA as a state agency, which also weighed in favor of treating PHEAA as an arm of the state. See id.

Considering the factors together, we held that the district court erred by dismissing Oberg's complaint:

> [A]lthough the third and fourth factors suggest that PHEAA is an arm of the state, the first (strongly) and second (albeit less strongly) point in the opposite direction. At this early stage, construing the facts in the light most favorable to the plaintiff, we must conclude that Dr. Oberg has alleged sufficient facts that PHEAA is not an arm of the state, but rather a "person" for FCA purposes.

Id. (internal quotation marks omitted). We vacated the district court's order dismissing Oberg's complaint, and we instructed the district court on remand "to permit limited discovery on the question whether PHEAA [was] truly subject to sufficient state control to render it a part of the state." Id. at 140-41 (internal quotation marks omitted).

On remand, the parties engaged in discovery, and PHEAA filed a motion for summary judgment on the arm-of-state issue. The district court granted the motion, holding that all four factors weighed in favor of arm-of-state status. See United

10

States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg III"), 77 F. Supp. 3d 493 (E.D. Va. 2015). In the district court's view, this court's contrary conclusion could not be sustained in light of the post-remand "factual development" of the case. Id. at 497. The district court therefore held that because PHEAA was an arm of Pennsylvania, it was not subject to suit under the FCA, and the court granted summary judgment in favor of PHEAA.

## II.

Oberg again appeals, arguing that the district court's analysis of the arm-of-state factors is inconsistent with our opinion in Oberg II and that its ultimate conclusions as to those factors are not supported by the record. In Oberg's view, the Pennsylvania statutes governing PHEAA's operation and the factual information developed through discovery establish that PHEAA is not an arm of Pennsylvania. Oberg thus contends that the district court erred by granting summary judgment in favor of PHEAA and dismissing his action.

"We review a grant of summary judgment de novo, applying the same standard as the trial court and without deference to the trial court." Dash v. Mayweather, 731 F.3d 303, 310 (4th Cir. 2013), cert. denied, 134 S. Ct. 1761 (2014). Summary judgment is appropriate only if "there is no genuine dispute as

11

to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this case, we see no material dispute about the relevant facts detailing PHEAA's operations and relationship with Pennsylvania. Instead, the dispute is over the legal effect of the materially undisputed facts -- whether the relevant statutes and the facts developed during discovery establish that PHEAA is the alter ego of Pennsylvania.[2] See Greene v. Barrett, 174 F.3d 1136, 1139-40 (10th Cir. 1999) ("If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law."). And that question is a pure question of law reviewed de novo. See United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist., 739 F.3d 598, 602 (11th Cir.) ("[W]hether an entity constitutes an arm of the state [and therefore not a "person" under the FCA] . . . is a question of law subject to de novo review."), cert. denied,

---

[2] While Oberg argues that the evidence establishes that PHEAA is not an arm of Pennsylvania, he also suggests that arm-of-state status is a question of fact to be resolved by a jury. We disagree. Although we held in Oberg II that whether a defendant is a "person" is an element of an FCA plaintiff's case, see Oberg II, 745 F.3d at 136, we nonetheless agree with PHEAA that personhood and arm-of-state status nonetheless remain legal issues to be resolved by the court. Cf. Farwell v. Un, 902 F.2d 282, 288 (4th Cir. 1990) (although negligence plaintiff "must prove that defendant owed plaintiff a duty, breached that duty, and that the breach proximately caused the claimed injury[,] . . . . whether and in what form any legal duty exists is a question of law for the courts").

12

134 S. Ct. 2312 (2014); cf. Hutto v. South Carolina Ret. Sys., 773 F.3d 536, 542 (4th Cir. 2014) ("Whether an action is barred by the Eleventh Amendment is a question of law that we review de novo."). We will summarize the statutes and evidence governing PHEAA's authority and operations before turning to Oberg's challenges to the district court's decision.

### III.

PHEAA was created as "a body corporate and politic constituting a public corporation and government instrumentality." 24 Pa. Stat. § 5101. PHEAA has the power to sue and be sued; enter into contracts; and own, encumber, and dispose of real and personal property. See id. § 5104(3); Oberg II, 745 F.3d at 139. During the time period relevant to this appeal, PHEAA was governed by a twenty-member board of directors composed of the Secretary of Education; three gubernatorial appointees; eight members of the Senate appointed by the Senate's president; and eight members of the House of Representatives appointed by the Speaker of the House. See 24 Pa. Stat. § 5103(a) (2006).[3] Board members may be removed by the official who appointed them. See Pa. Const. art. VI, § 7 ("All civil officers shall hold their offices on the condition that

---

[3] In 2010, 24 Pa. Stat. § 5103 was repealed and a revised version of it was recodified at 71 Pa. Stat. § 111.2. The changes to the composition of PHEAA's board are not relevant to the disposition of this appeal.

they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed."); Burger v. School Bd., 923 A.2d 1155, 1162 (Pa. 2007) ("[A]rticle VI, § 7 of] the Constitution does not vest in the appointing power unfettered discretion to remove. Instead, valid removal depends upon the officer behaving in a manner not befitting the trust placed in him by the appointing authority.").

PHEAA's purpose is "to improve the higher educational opportunities of [Pennsylvania] residents . . . who are attending approved institutions of higher education . . . by assisting them in meeting their expenses of higher education." 24 Pa. Stat. § 5102. To further its statutory purpose, PHEAA is authorized to issue, purchase, service, and guarantee student loans. See 24 Pa. Stat. § 5104.

PHEAA is statutorily authorized to "borrow moneys by making and issuing notes, bonds and other evidences of indebtedness of the agency . . . for the purposes of purchasing, making or guaranteeing loans." Id. § 5104(3). The Governor must approve all debt issuances, see id., and the General Assembly has capped the total amount of debt that PHEAA may incur, see 24 Pa. Stat. § 5105.1(a.1). Under state law, PHEAA bears sole responsibility

14

for its bonds and other debts. See id. § 5104(3) ("[N]o obligation of [PHEAA] shall be a debt of the State and [PHEAA] shall have no power to pledge the credit or taxing power of the State nor to make its debts payable out of any moneys except those of the corporation."). Because the Pennsylvania General Assembly has determined that PHEAA is performing an "essential governmental function," PHEAA bonds are generally free from taxation. 24 Pa. Stat. § 5105.6.

As noted, PHEAA is now "one of the nation's largest providers of student financial aid services." Oberg II, 745 F.3d at 138. During the time period relevant to this case, PHEAA's commercial activity -- much of it conducted under the trade names "American Education Services" and "FedLoan Servicing" -- included issuing loans to Pennsylvania students, servicing loans for non-Pennsylvania students, and guaranteeing loans issued to students in Delaware, Georgia, and West Virginia. PHEAA's 2014 financial statements show revenues exceeding $600 million, net revenues of more than $220 million, and unrestricted net assets of more than $700 million. See J.A. 3147-48. The earnings from PHEAA's extensive commercial operations have made PHEAA "financially independent" of the Commonwealth, Oberg II, 745 F.3d at 139, and PHEAA has received no appropriations to support its operations since 1988.

15

PHEAA administers Pennsylvania's State Grant Program, distributing appropriated funds as grants and scholarships to qualifying students. PHEAA absorbs the costs of administering the program, however, and disburses 100% of the appropriated funds to students. In 2005, PHEAA contributed $25 million of its earnings to supplement the State Grant Program, and it has made contributions ranging from $45 – 75 million in many, but not all, of the years since.

During the time period relevant to this case, PHEAA issued revenue bonds to fund the loans it originated, repaying the bonds with loan-repayment revenues.[4] PHEAA created special-purpose entities incorporated under Delaware law to formally issue the bonds and hold the student-loan receivables as assets. These revenues are held in trust in accounts outside of the Pennsylvania Treasury until the bonds are repaid or the release provisions of the underlying documents are otherwise satisfied. These trust accounts represent the bulk of PHEAA's corporate wealth -- more than $6 billion of $8.6 billion total long term assets. See J.A. 3148.

---

[4] PHEAA stopped originating federally guaranteed student loans in 2008, "due to the global fiscal crisis." J.A. 327. See J.A. 2440. As of July 1, 2010, the federal government took over as the originator of all federal student loans. See Health Care & Educ. Reconciliation Act of 2010, Pub. L. No. 111-152, §§ 2201-2213, 124 Stat. 1029, 1074-81.

As to the other revenues generated by PHEAA's commercial activities, however, state law requires them to be deposited in the Pennsylvania Treasury, see 24 Pa. Stat. § 5104(3), a requirement similar to that applicable to other state agencies. PHEAA's revenues on deposit with the state Treasury are held in a segregated fund known as the "Educational Loan Assistance Fund." 24 Pa. Stat. § 5105.10. Although the revenues are in the custody of the state Treasurer, state law expressly vests control over the revenues in PHEAA. See 24 Pa. Stat. § 5104(3) (requiring revenues earned through financial-services activities to be "deposited in the State Treasury," but providing that the revenues "shall be available" to PHEAA and "may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency"); id. § 5105.10 ("[A]ll appropriations and payments made into the [Educational Loan Assistance Fund] are hereby appropriated to the board and may be applied and reapplied as the board shall direct and shall not be subject to lapsing.").

Much like funds invested in a mutual fund, PHEAA's funds, though separately accounted for, are commingled with the funds of other Commonwealth agencies for investment purposes. See 72 Pa. Stat. § 301.1 (generally authorizing Treasurer to invest funds held in state depositories); see also J.A. 2474 (PHEAA treasurer's description of investment process: "It works kind of

17

like a mutual fund . . . taking money from [separate Commonwealth agencies] and keeping track of what each of us has, but putting it together and putting it into investment funds."). The Treasury Department devises and executes the investment strategy for the commingled funds. See 72 Pa. Stat. § 301.2; see also J.A. 2796.

State law prohibits payment "from any of the funds of the State Treasury" without approval of the Treasurer. 72 Pa. Stat. § 307. To obtain approval for payment of funds in the custody of the Treasurer, PHEAA must present the Treasurer with requisitions for payment. The Treasury Department audits the requisitions by reviewing "backup documentation such as invoices, contracts, [and] purchase orders" and "confirming the authority for the payment (e.g., a valid supporting contract), and a match between the amount due on the invoice and the payment request." J.A 673-74. "If the requisitions appear to be lawful and correct, the Treasurer issues his warrant for payment." J.A. 673. If payment is approved, the Treasury Department transfers funds to PHEAA electronically or sends PHEAA a check. The checks are payable to the vendor and are drawn on the state Treasury account and signed by the Treasurer.

For purposes of the "Commonwealth Attorneys Act," 71 Pa. Stat. §§ 732-101 – 732-506, the term "Commonwealth agency" includes "independent" and "executive" agencies; PHEAA is

18

classified as an independent agency, see id. § 732-102. As is the case with other Commonwealth agencies, if the Attorney General provides PHEAA with a legal opinion, PHEAA must follow the advice set out in the opinion. See id. § 702-204(a)(1).

While PHEAA has the authority to enter into contracts, it must, like other Commonwealth agencies, submit contracts involving more than $20,000 for a "form and legality" review by the Attorney General. 71 Pa. Stat. § 732-204(f). The review involves determining "whether the contract has all of the legal terms that the Commonwealth requires and no terms that are prohibited"; whether "PHEAA has the authority to enter into the contract"; and whether "the contract is constitutional under the State and Federal constitutions." J.A. 713; see 71 Pa. Stat. § 732-204(f) (requiring Attorney General to determine whether a "contract is in improper form, not statutorily authorized or unconstitutional"). If an agency seeks to enter into a contract with a party who owes money to the Commonwealth, the Attorney General will not review the contract until the debt has been satisfied. See J.A. 2856.

PHEAA is authorized to pursue student-loan collection actions independently, see 24 Pa. Stat. § 5104.3, but the Commonwealth Attorneys Act otherwise requires the Attorney General to represent PHEAA in civil litigation absent a delegation of authority, see 71 Pa. Stat. § 732-204(c). PHEAA's

19

standard practice is to seek such delegations in all non-collection actions; PHEAA's general counsel could not recall a request ever being denied. A private law firm serves as counsel to PHEAA's board. The Attorney General's office would have conducted the form-and-legality review of the contract engaging the law firm, but the decision to engage counsel did not require a delegation from or other review by the Attorney General.[5]

Pennsylvania law treats PHEAA as a typical state agency in other respects. PHEAA is authorized to promulgate and enact regulations, but the regulations must be approved by Pennsylvania's Regulatory Review Commission. See 71 Pa. Stat. §§ 745.3, 745.5. PHEAA must report its year-end condition to the Governor and the legislature. See 24 Pa. Stat. § 5108. It is subject to examination by the Commonwealth's Auditor General, see id., and was in fact the subject of a "special performance audit" in 2008. J.A. 2312. Its property and income are exempt from state taxation, see 24 Pa. Stat. § 5107, and all of its properties revert to the Commonwealth upon dissolution, see id. § 5109.

PHEAA's employees are paid through the state Treasury, receive healthcare benefits through the Commonwealth, and participate in the Commonwealth's retirement system. PHEAA's

---

[5] In 2013, PHEAA paid outside counsel a total of more than $7 million.

board members and executives are subject to state ethics laws. See 65 Pa. Cons. Stat. §§ 1102-03. PHEAA executives, however, are not paid in accordance with state pay scales. At least until 2007, PHEAA's top executives were compensated under a "unique" and very generous pay scale created by the PHEAA board. J.A. 2342.

For accounting purposes, the Commonwealth treats PHEAA as a "component unit" of the "primary government," J.A. 595, and it includes PHEAA's financial information in the Commonwealth's Comprehensive Annual Financial Report. The Report defines the "primary government" to include the Commonwealth and "all Commonwealth departments, agencies, boards, and organizations that are not legally separate." J.A. 595. "Component units" are defined as "all legally separate organizations for which the [primary government] is financially accountable, and other organizations for which the nature and significance of their relationship with the [primary government] are such that exclusion [of their financial information] would cause the financial statements to be misleading or incomplete." Id.

IV.

We turn now to Oberg's specific challenges to the district court's analysis of the arm-of-state issue.

A. State Treasury

21

The first arm-of-state factor focuses on "whether any judgment against the entity as defendant will be paid by the State," Oberg I, 681 F.3d at 580 (internal quotation marks omitted), an inquiry that includes legal or functional liability, see Oberg II, 745 F.3d at 137. We held in Oberg II that Pennsylvania was not legally liable, see id. at 138, and that conclusion remains controlling in this appeal, see Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132, 142 (4th Cir. 2015) (explaining that under the "law of the case" doctrine, rulings by an appellate court on questions of law generally "must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal" (internal quotation marks omitted)).[6] Our analysis in this appeal, therefore, will focus on functional liability.

---

[6] The law-of-the-case doctrine does not apply if "the prior decision was clearly erroneous and would work manifest injustice." TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009) (internal quotation marks omitted). Although PHEAA suggests, almost in passing, that we erred by rejecting legal liability in Oberg II, see Brief of Respondent at 22 n.6, "[a] prior decision does not qualify for this . . . exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." TFWS, 572 F.3d at 194 (internal quotation marks and alteration omitted). Given the previously discussed statutory provisions disclaiming liability for PHEAA's obligations and requiring PHEAA's debts to be paid from moneys of the corporation, Oberg II's no-legal-liability holding doesn't strike us as wrong at all, much less dead-fish wrong.

The functional-liability analysis looks to whether, as a practical matter, a judgment against a state-created entity puts state funds at risk, despite the fact that the state is not legally liable for the judgment. Thus, functional liability will be found "[w]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries." Hess, 513 U.S. at 50, cited in Oberg II, 745 F.3d at 137; Ristow v. South Carolina Ports Auth., 58 F.3d 1051, 1054 (4th Cir. 1995) (finding Ports Authority to be an arm of the state despite absence of legal liability because the state "provides whatever economic support is necessary over and above the Port Authority's net revenues to insure its continued vitality" and "takes back any portion of the Authority's net revenues, which, in its legislative judgment, is not necessary or desirable for the Ports Authority's operation"). A state may also be functionally liable if the funds available to pay any judgment effectively belong to the state rather than the agency.

Applying these principles in Oberg II, we concluded that Pennsylvania was not functionally liable because PHEAA was statutorily vested with control over the significant revenues generated by its extensive commercial activities, such that the judgment would be paid with funds belonging to PHEAA, not Pennsylvania. See Oberg II, 745 F.3d at 139 ("[B]ecause state

23

law instructs that PHEAA would pay any judgment in this case with its own moneys from its segregated fund, the first factor weighs heavily against holding that PHEAA is an arm of the state." (citation omitted)); id. at 138 (noting that "PHEAA's substantial 'moneys' derive exclusively from its own operations").

The district court rejected that conclusion on remand, however. Believing that this court's analysis could not be sustained in light of the post-remand "factual development" in the case, Oberg III, 77 F. Supp. 3d at 497, the district court held that Pennsylvania would be functionally liable for any judgment entered against PHEAA. In the district court's view, the fact that PHEAA's earnings are deposited in the state Treasury, where they are commingled with other state funds and cannot be spent without approval of the Treasurer, showed that "the Commonwealth retains [such] significant control over PHEAA's assets and generated revenue" that "[p]ractically speaking, PHEAA's money becomes State money." Id. We agree with Oberg that the district court's analysis on this point is largely inconsistent with our decision in Oberg II.

Notwithstanding the district court's "factual development" reference, its analysis did not depend on the evidence developed during discovery, but instead turned on its understanding of the general statutory framework governing PHEAA's operation. As we

24

have already explained, however, this court in Oberg II rejected the all-funds-are-state-funds argument.  Instead, we held that because PHEAA was statutorily vested with control over the funds on deposit with the state Treasury, PHEAA's revenues remained "moneys . . . of the corporation" despite the statutory provisions relied on by the district court.  Oberg II, 745 F.3d at 138 (internal quotation marks omitted).

Given that we were reviewing the granting of a Rule 12(b)(6) motion to dismiss in Oberg II, our holding was based on an assumption that the control statutorily vested in PHEAA was in fact exercised by PHEAA.  Nonetheless, because we held that Oberg had plausibly alleged that PHEAA was not an arm of the state, we necessarily concluded that the statutory framework governing PHEAA's operations did not, in and of itself, establish a level of control sufficient to make PHEAA an arm of Pennsylvania.  If the relevant statutory facts focused on by the district court -- that PHEAA's revenues are held in the state Treasury and cannot be used for payment without approval of the Treasurer -- were enough to establish functional liability even in the face of the PHEAA's statutorily granted power over those revenues, then we would have affirmed, not vacated, the district court's arm-of-state conclusion in Oberg II.

In finding Pennsylvania functionally liable, the district court thus ignored the statutory facts that we found critical to

25

the issue -- PHEAA's control over its significant independent funds -- and gave the other relevant statutory facts a legal effect that we rejected in Oberg II. We therefore agree with Oberg that the district court erred by analyzing the functional liability question in an manner inconsistent with the approach dictated by Oberg II.

This court, however, "review[s] judgments, not opinions." Catawba Indian Tribe of S.C. v. City of Rock Hill, 501 F.3d 368, 372 n.4 (4th Cir. 2007) (per curiam). Thus, even though the district court's analysis of the state-treasury factor was erroneous, reversal would not be required if the evidence developed through discovery shows a level of control actually exercised by the Commonwealth that changes the Oberg II calculus and establishes that Pennsylvania is functionally liable for a judgment against PHEAA. See Oberg II, 745 F.3d at 140-41 (remanding for "limited discovery on the question whether PHEAA is truly subject to sufficient state control to render it a part of the state" (emphasis added; internal quotation marks and alterations omitted)). We turn to that question now.

1.

Discovery produced substantial evidence of PHEAA's financial strength and independence.

PHEAA's financial success, which has never really been in dispute, is clearly established in the record. For 2006, when

26

the last of the conduct alleged in Oberg's complaint took place, PHEAA's financial statements show gross revenues of $416 million, net revenues of $156 million, and total net assets of $498 million. J.A 2573-74. PHEAA's 2014 financial statements show impressive growth – gross revenues of $640 million, net revenues of $222 million, with total net assets of $1 billion and unrestricted net assets of $709 million.[7] See J.A. 3147-48. The evidence thus establishes that PHEAA has "substantial moneys," as we assumed to be true in Oberg II. 745 F.3d at 138 (internal quotation marks omitted).

PHEAA is statutorily vested with control over its funds on deposit with the Treasury Department, and discovery confirmed that PHEAA is in fact exercising control over its funds. PHEAA's control over fiscal matters is established, first and foremost, by PHEAA's own officials. Timothy Guenther, PHEAA's treasurer, repeatedly testified in his deposition that financial decisions were made by PHEAA's Board of Directors. Guenther testified that PHEAA's board approves PHEAA's annual budget based on revenue and expenses estimates developed by PHEAA staff; decides each year what portion (if any) of its earnings

---

[7] As noted, PHEAA stopped originating student loans in 2008. Despite the loss of that line of business, PHEAA's revenues have increased dramatically. That increase is primarily attributable to a contract with the federal government to service federally issued student loans.

will be used to supplement the State Grant Program; and establishes PHEAA's corporate investment policy. And as to the annual report of its major financial decisions and overall financial condition that PHEAA is required to make to the Governor and General Assembly, Guenther acknowledged that the financial decisions reflected in that report were made by PHEAA's board. See J.A. 2469.

The declaration of PHEAA's chairman of the board likewise shows that PHEAA, not the Commonwealth, controls PHEAA's operations and its funds. See J.A. 246 ("PHEAA's Board makes sure that as much excess revenue, in light of PHEAA's long-term operational and financial requirements, is contributed to programs and financial assistance for the benefit of Pennsylvania students" (emphasis added)); J.A. 249 ("The Board oversees PHEAA, makes the policy decisions for the direction of [the] agency, and tasks PHEAA's executives and managers with implementing those decisions and directions on a day-to-day basis."); id. ("PHEAA's Board reviews, analyzes and approves PHEAA's internal budget, which is proposed by management and presented to the Board."); see also J.A. 2406 ("Briefing Book" preparing PHEAA CEO for appearance before legislative committee stating that "[t]he board is responsible for how we spend our money").

Specific incidents and events described in the record provide further evidence of PHEAA's control. For example, when Commonwealth revenues fall short of expectations, it is not unusual for the Governor to ask state agencies to cut spending and return a portion of their budget to the General Assembly. The record contains two gubernatorial letters requesting PHEAA's assistance, and these letters distinguish PHEAA from other state agencies and make it clear that PHEAA has control over its budget that other agencies do not. See J.A. 3118 (letter from Gov. Corbett stating that he had "directed agencies under [his] jurisdiction to freeze . . . spending" but was "ask[ing] that [PHEAA] make the same sacrifice as the agencies under [his] jurisdiction" (emphasis added)); J.A. 3120 (letter from Gov. Rendell noting that he had "directed commonwealth agencies to place 1.9% of their discretionary budgets into budgetary reserve" but "ask[ing] [PHEAA] to make the same spending reductions that our commonwealth agencies are making" (emphasis added)).

In addition, in 2007, PHEAA settled a dispute with the Department of Education related to the interest-subsidy issue raised in Oberg's complaint for $11.3 million. According to PHEAA's treasurer, PHEAA paid the Department of Education with loan-repayment funds held in trust in accounts outside the Pennsylvania Treasury. PHEAA also settled a dispute with the

29

IRS for $12.3 million, and a portion of the IRS settlement was also paid from assets held in trust.  See J.A. 2480.  The Attorney General would have conducted the form-and-legality review of the settlements, but it otherwise had no involvement in the substantive decision to settle the disputes or the negotiation of the settlement terms.  See J.A. 2845, 2847-48. The General Assembly was not required to approve the settlements, and it did not appropriate funds to replace those spent by PHEAA.  In our view, PHEAA's actions in settling the disputes demonstrates PHEAA's control over its funds and its financial independence from the Commonwealth.  And the fact that the settlements were paid with a portion of the $6 billion held in trust outside the state Treasury is additional evidence of PHEAA's ability to fund a judgment without the use of state funds.

PHEAA's creation and support of the Pennsylvania Higher Education Foundation ("PHEF") also provides compelling evidence of PHEAA's financial independence and control.[8]  Although PHEAA itself is authorized to solicit and receive private donations, see 24 Pa. Stat. § 5104(3) & (8); id. § 5106, PHEAA officials believed that "'many private donors are reluctant to donate funds to a government agency,'" 2008 Auditor General's Report at

---

[8] PHEF has been inactive since 2009.

30

74, Exhibit 1 to Oberg's Opposition to PHEAA's Motion for Summary Judgment ("2008 Auditor General's Report").[9] PHEAA thus created PHEF, a one-employee,[10] tax-exempt charitable organization, for the purpose of soliciting private corporate donations. PHEAA provided the funds and administrative services necessary for PHEF's operation. From 2001 through 2007, PHEAA provided PHEF with more than $86 million in cash and donated services. Over that same period, PHEF collected $11.1 million in private donations. See 2008 Auditor General's Report at 75. While PHEAA has the general authority "[t]o perform such . . . acts as may be necessary or appropriate to carry out effectively the objects and purposes of the agency," 24 Pa. Stat. § 5104(7), PHEAA had no specific statutory authority to create or make donations to a charitable organization, see J.A. 2410 ("Briefing Book" preparing PHEAA CEO for appearance before legislative committee stating that there was "[n]o express legislative authority" for PHEAA's funding of PHEF).

In our view, the evidence outlined above establishes the critical facts assumed in Oberg II when we rejected the claim of

---

[9] The parties included only a portion of this report in the Joint Appendix.

[10] PHEF's single employee is its president and CEO. From PHEF's inception through at least August 2008, PHEF's president and CEO was a former president and CEO of PHEAA itself. See 2008 Auditor General's Report at 75.

31

functional liability: that PHEAA has substantial, commercially generated revenues held both inside and outside the state Treasury, and that PHEAA exercises its statutory right to control those revenues. See Burrus v. State Lottery Comm'n, 546 F.3d 417, 420 (7th Cir. 2008) ("Because the Lottery raises revenue on its own account, controls and funds its own operations, and does not expose state coffers when monetary judgments are rendered against it, we conclude that it is an entity financially independent from the state."). As we discuss below, state law does impose some restrictions on PHEAA's use of its funds, but those restrictions do not divest PHEAA of control over its funds or otherwise establish that the Commonwealth is functionally liable for a judgment against PHEAA.

2.

The primary way the Commonwealth exercises some control over PHEAA's funds is through the statutory requirements that PHEAA deposit its commercial revenues in the Treasury Department and the Treasurer approve any payment of funds held by Treasury.

To the extent that PHEAA continues to assert that these statutory provisions establish that all of PHEAA's funds on deposit in the state Treasury effectively belong to the

32

Commonwealth,[11] that argument is foreclosed by Oberg II, which necessarily concluded that these statutory requirements do not, in and of themselves, transform PHEAA funds into Commonwealth funds. See Oberg II, 745 F.3d at 138; cf. Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 661 (3d Cir. 1989) (en banc) ("The [statutory] designation of the money as 'public' simply does not answer the question of who has dominion over the money in [state-created entity's] accounts."). Indeed, Pennsylvania law expressly recognizes that not all funds held by the Treasurer actually belong to the Commonwealth. See 72 Pa. Stat. § 301 (requiring Treasurer to deposit in specified accounts "all moneys of the Commonwealth received by it, including moneys not belonging to the Commonwealth but of which the Treasury Department or the State Treasurer is custodian" (emphasis added)).

PHEAA also contends, however, that the actual payment-approval process, as established through discovery, "significantly constrain[s]" its spending and signifies a level

---

[11] In support of this argument, PHEAA points to the testimony of PHEAA treasurer Timothy Guenther, who stated in his deposition that "[a]ll PHEAA funds held in the Treasury are funds of the Commonwealth." J.A. 2447. To the extent Guenther asserts that the funds are Commonwealth funds simply because they are deposited in the state Treasury, that argument is foreclosed by Oberg II. Moreover, whether PHEAA funds belong to the Commonwealth for purposes of the arm-of-state analysis is ultimately a question of federal law that cannot be established by a witness's conclusory assertion of the ultimate legal issue.

33

of control that makes the Commonwealth functionally liable. Brief of Respondent at 18. We disagree.

The Treasury Department's review-and-approval process, as described by the evidence in the record, is not particularly complicated. PHEAA prepares and submits a payment request; the Treasury Department reviews the payment request and its "backup documentation such as invoices, receipts, contracts, [and] purchase orders," to confirm the existence of a contract authorizing payment and an invoice matching the payment request. J.A 673. If the review raises questions, the Department rejects the request and returns it to PHEAA for resolution of the issues. If the review shows the payment request "to be lawful and correct, the Treasurer issues his warrant for payment." Id. When a check is required, the vendor is paid with a check drawn on the state Treasury and signed by the Treasurer.

The approval process clearly reflects some level of Commonwealth control over PHEAA, as it effectively requires PHEAA to adopt certain book-keeping procedures if it wants its vendors to be paid. The Treasury Department's review, however, is not a substantive review. The Department does not evaluate the wisdom of the underlying contract or the reasonableness of the agreed-upon price, but instead simply confirms that a valid contract authorizes payment and that the payment amount sought matches the amount agreed to in the contract. The approval

34

process thus does not constrain or otherwise interfere with PHEAA's statutory authority to make the <u>substantive</u> decisions controlling the use of its revenues. <u>See</u> 24 Pa. Stat. § 5104(3) (PHEAA revenues held in the state Treasury "shall be available" to PHEAA and "utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency"); <u>id.</u> § 5105.10 (deposits into PHEAA's segregated state Treasury account "are hereby appropriated to the board and may be applied and reapplied as the board shall direct"). Indeed, the approval process doesn't even commence until PHEAA has exercised its discretion to enter into a contract or otherwise take action that requires a payment to be made.

PHEAA, however, argues that, "[a]s the thousands of examples of requisition questions and denials produced in discovery clearly show, Treasury's review is no mere rubber stamp." Brief of Respondent at 19. In PHEAA's view, the approval process "is not ministerial in nature" because it "involves a comprehensive, multi-step process involving several levels of submission, substantive review, and authorization." Brief of Respondent at 19 (internal quotation marks omitted). We disagree.

Whether the review-and-approval process is ministerial depends on the nature of the review, not on the frequency with which the review identifies problems. And here, the undisputed

35

evidence shows that Treasury Department officials simply check, cross-check, and confirm the information contained in contracts, purchase orders, and invoices. Complicated contracts may sometimes lead to lengthy email exchanges trying to unravel the agreed-upon pricing terms, but even then, the Department's role is simply to confirm that a valid contract authorizes the payment being sought in the amount being sought.[12]

We recognize, of course, that by dictating the steps to be followed for payment to be made to a PHEAA vendor, the approval requirement places some not-insignificant constraints on the manner in which PHEAA pays its bills. Dictating specific payment procedures, however, is not the same as dictating spending policy and priorities. Because the Treasury Department's ministerial, checklist-focused approval process does not substantively constrain PHEAA's fiscal discretion, the approval requirement does not, in and of itself, give

---

[12] When arguing that the approval process is not ministerial, PHEAA notes that "after receiving a $63 invoice from PHEAA's outside counsel seeking reimbursement for a meal, Treasury demanded an itemized receipt from PHEAA and inquired whether the meal included alcohol." Brief of Respondent at 19 n.5. Given that Pennsylvania's reimbursement policy precludes reimbursement for alcoholic beverages and requires "[c]omplete justification" for reimbursement requests, see Commonwealth Travel Procedures Manual §§ 4.1, 7.1 (Nov. 1, 2011) (PDF file saved as ECF opinion attachment), the Treasury Department simply asked PHEAA to provide the information necessary to show that payment was authorized. We see no relevant difference between that request and a request for PHEAA to provide the contract underlying a given invoice.

Pennsylvania a level of control over PHEAA funds sufficient to transform PHEAA's independently earned revenues into money belonging to the Commonwealth.

PHEAA also argues that Pennsylvania is functionally liable because PHEAA's funds on deposit in the Treasury are commingled with state funds and invested by the Treasurer. We disagree. That PHEAA's revenues were commingled with state revenues and invested by the Treasurer were statutory facts before the court in Oberg II but were insufficient, standing alone, to establish functional liability. While discovery has added to those statutory facts and establishes that the Treasurer makes the decisions about investing these commingled funds, we do not believe that adds much to the analysis. The commingling and investing -- a process that PHEAA's own treasurer compared to an ordinary mutual fund -- may reflect the Treasurer's custodial control over the funds on deposit, but it does not establish a lack of substantive control by PHEAA. That is, PHEAA is statutorily vested with the power to control its commercially generated revenues on deposit in the Treasury. The Treasurer's concurrent authority to use those funds to generate interest does not somehow divest PHEAA of control over its funds or otherwise interfere with PHEAA's exercise of substantive control over its funds. Accordingly, we conclude that PHEAA's own "moneys," generated through PHEAA's commercial activities and

37

held in a segregated account, are not transformed into "moneys" of the Commonwealth simply because they are commingled with other state funds for investment purposes.

PHEAA also contends that it is "fiscally dependent" on the Commonwealth, and the Commonwealth is therefore functionally liable, because it must submit annual budget requests to obtain appropriations from the General Assembly, the legislature has capped the total amount of debt PHEAA can incur, and the Governor must approve all debt issuances. Brief of Respondent at 19. Again, we disagree.

As the record establishes, PHEAA submits budget requests only to receive the appropriated funds to be distributed under the State Grant Program. PHEAA is not required to submit budget requests to gain access to its independently generated revenues, and the General Assembly does not take PHEAA's revenues to fill holes in the Commonwealth's budget. PHEAA's participation in the state budgeting process in its capacity as administrator of the State Grant Program thus does not cast doubt on PHEAA's power to control its extensive, independent funds, nor does it otherwise make PHEAA fiscally dependent on Pennsylvania.

As to the statutory limit on PHEAA's total debt and the gubernatorial-approval requirement, these provisions may well make PHEAA fiscally dependent on Pennsylvania for state accounting purposes. See Commonwealth's Comprehensive Annual

38

Financial Report, J.A. 595-96 (treating PHEAA as a "component unit" of the Commonwealth's "primary government" because "PHEAA is fiscally dependent, as the Governor must approve the issuance of its debt"). For purposes of the arm-of-state inquiry, however, we do not believe these restrictions suffice to make Pennsylvania functionally liable for a judgment against PHEAA.

Preliminarily, we note that while the debt-limit and gubernatorial-approval provisions do place some constraints on PHEAA's business activities, nothing in the statutes directly addresses PHEAA's control over its revenues, which is the key to the functional liability question in this case. Moreover, these statutory requirements obviously have not been obstacles to PHEAA's financial success, and there is no basis in the record for us to conclude that Pennsylvania in the future would use these powers to shrink PHEAA's operations and revenues to a point where it could not withstand a judgment against it. See Hess, 513 U.S. at 50.

In any event, while these statutory provisions do restrict PHEAA's financial independence to some degree, Pennsylvania municipalities--which are subject to liability under the FCA-- also face similar requirements.[13] These statutes thus provide

---

[13] See Pa. Const. art. IX, § 10 ("[T]he General Assembly shall prescribe the debt limits of all units of local government including municipalities and school districts."); 53 Pa. Cons. (Continued)

little help in "draw[ing] the line between a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego." Oberg I, 681 F.3d at 580 (internal quotation marks omitted). The debt-limit and gubernatorial-approval provisions were among the statutory facts that we considered in Oberg II and found insufficient, in and of themselves, to compel arm-of-state status, and there is nothing in this record establishing that these statutory facts should be given more weight than we gave them in Oberg II.

3.

Under these facts, the district court erred in concluding that Pennsylvania was functionally liable for a judgment against PHEAA. As we have explained, PHEAA's "substantial," independently generated corporate wealth, Oberg II, 745 F.3d at 138, and PHEAA's control over that wealth, were key to Oberg II's functional-liability analysis. The evidence discussed above confirmed the existence of these facts.

---

Stat. § 8022(a) (placing limitations on the amount of nonelectoral debt incurred by local government units); 53 Pa. Cons. Stat. § 8110(a) (requiring local governments to submit a "debt statement" to the Department of Community and Economic Development of the Commonwealth before issuing bonds); 53 Pa. Cons. Stat. § 8111 (Department must approve local government's application before local government may issue bonds).

40

Far from being a thinly capitalized agency, see Hess, 513 U.S. at 50, PHEAA earns hundreds of millions of dollars a year through its commercial financial services operations and holds more than $1 billion in net assets. While its commercial earnings are deposited in the Pennsylvania Treasury, PHEAA is statutorily vested with control over those revenues. See 24 Pa. Stat. § 5104(3); id. § 5105.10. And as outlined above, the evidence produced through discovery confirms that PHEAA is in fact exercising the control granted to it by statute and that substantive decisions about the use of its substantial revenues are made by PHEAA, not the Governor or the General Assembly. This point is exemplified by PHEAA's creation of PHEF and its donation to PHEF of $86 million in cash and services goods, all without specific statutory authority.

Of course, PHEAA is subject to some measure of state control over its finances, including the gubernatorial-approval requirement, the legislative cap on total debt, and the Treasury payment-approval requirement. Oberg II held that those facts did not outweigh the control PHEAA had over its independent funds, however, and the record contains no evidence that causes us to reach a different conclusion. The gubernatorial-approval requirement and legislative cap may theoretically place a ceiling on PHEAA's earning capacity at some as-yet unestablished level, but an income ceiling does not affect PHEAA's right or

41

ability to control the revenues it actually earns. The Treasury payment-approval process, though not an entirely inconsequential burden, is nonetheless a purely ministerial process that does not in any way restrict PHEAA's authority to set policy and make all substantive decisions about where and how its funds are best directed. None of these facts, whether considered individually or collectively, materially diminish or constrain PHEAA's substantive control (vested by law and exercised in fact) over its funds and financial decisions.

PHEAA, however, objects to any consideration of the extent of its corporate wealth and its ability to fund a judgment through its own resources, insisting that arm-of-state status cannot depend on whether the state-created entity happens to be "flush at a particular juncture." Brief of Respondent at 25. PHEAA argues that for the first two decades of its existence, it depended on state appropriations to fund its operations. PHEAA contends that in those early years, "the Commonwealth would have been on the hook to pay a judgment against PHEAA," and it contends that "[t]here is no principled basis for rescinding PHEAA's status as an arm of the Commonwealth simply because it now enjoys financial success by discharging its statutory mission." Brief of Respondent at 26. We disagree.

First, Oberg II requires us to consider PHEAA's wealth and its ability to use its funds to pay a judgment. Those facts, as

previously discussed, were the critical facts on which Oberg II's functional-liability decision was grounded. Oberg II thus established that PHEAA's access to its substantial corporate wealth was relevant to the functional-liability question, and that determination is a legal ruling that remains applicable in this appeal. See TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (internal quotation marks omitted)).

Moreover, even were we to ignore Oberg II's focus on these facts, case law would still require their consideration. Specifically, the Supreme Court's decision in Hess establishes that an agency's access to independent funds is relevant to the functional-liability question.

In Hess, the Court explained that, "[w]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency." Hess, 513 U.S. at 50 (internal quotation marks omitted). "There is no such requirement where the agency is structured . . . to be self-

43

sustaining." Id.[14] When determining whether the state-created entity was "structured" to be "self-sustaining," the Hess Court considered the entity's financial statements, which showed that the entity "had over $2.8 billion in net assets and $534 million in its General Reserve Fund," id. at 36 n.6, as well as the entity's independent source of revenues, which "account[ed] for the Authority's secure financial position," id. at 36. Although the creating states otherwise exercised a not-insignificant amount of control over the entity, see id. at 36-37, the Court held in Hess that the entity was not entitled to share in the states' Eleventh Amendment immunity given the entity's "anticipated and actual financial independence," id. at 49; see also id. at 52 ("[T]he Port Authority is financially self-sufficient; it generates its own revenues, and it pays its own debts. Requiring the Port Authority to answer in federal court . . . does not touch the concerns -- the States' solvency and dignity -- that underpin the Eleventh Amendment.").

In our view, the Court's approach in Hess forecloses any argument that an entity's independent financial resources and its ability to fund any judgments against it are not relevant to the functional-liability inquiry. PHEAA suggests, however, that

_____

[14] Although Hess involved an entity created by two states, we have held that "the same general principles identified in [Hess] must also apply in the single state context." Gray v. Laws, 51 F.3d 426, 432 (4th Cir. 1995).

44

Hess's focus on the financial circumstances of the state-created entity was subsequently rejected by the Supreme Court in Regents of the University of California v. Doe, 519 U.S. 425 (1997), which PHEAA contends held that the state's "potential" liability was the key factor in the arm-of-state inquiry. We disagree.

In Regents, the question was whether the University of California was an arm of the state for Eleventh Amendment purposes. Although there was no dispute that California was legally liable for the University's debts, see id. at 428, the Ninth Circuit nonetheless concluded that the University was not an arm of California because a contractual indemnification agreement with the federal government would have relieved California of the financial consequences of a judgment in that case, see id. The Supreme Court reversed. Rejecting "the notion that the presence or absence of a third party's undertaking to indemnify the agency should determine whether it is the kind of entity that should be treated as an arm of the State," id. at 431, the Supreme Court held that "with respect to the underlying Eleventh Amendment question, it is the entity's potential *legal* liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant," id. (emphasis added).

The Regents Court thus held that if the state is legally liable for a judgment against the state-created entity, the entity is entitled to Eleventh Amendment immunity and does not lose that immunity by virtue of an indemnity agreement that ultimately shifts the state's loss to a third party. See id. at 430-31; see also Cash, 242 F.3d at 221-22 n.1 ("[I]n Regents, the Court held that the fact that a judgment against the State would be covered by the voluntary indemnification agreement of a third party did not strip away the State's Eleventh Amendment immunity because the State still bore the legal risk of an adverse judgment." (internal quotation marks omitted)). Because Regents addressed Hess and built on Hess's analysis when reaching its own ruling, see Regents, 519 U.S. at 430-31, Regents' focus on legal liability cannot somehow be understood as a silent rejection of the heart of Hess's analysis of functional liability.[15]

---

[15] This court has concluded that Regents' use of "potential" liability, Regents, 519 U.S. at 431, requires us to consider the effect of a "hypothetical" judgment that exceeds the entity's revenues. See Hutto v. S.C. Ret. Sys., 773 F.3d 536, 545 (4th Cir. 2014) ("[T]he proper inquiry is not whether the state treasury would be liable in this case, but whether, hypothetically speaking, the state treasury would be subject to potential legal liability if the [state-created entity] did not have the money to cover the judgment." (internal quotation marks omitted)). We have already held that the Commonwealth is not legally liable for a judgment against PHEAA. See Oberg II, 745 F.3d at 138. And for the reasons previously discussed, PHEAA's control over significant cash reserves means there is little (Continued)

46

In sum, PHEAA is engaged in nationwide, commercial financial-aid activities that bring in hundreds of millions of dollars in net revenues every year and have allowed it to accumulate more than one billion dollars in net assets, and PHEAA has substantive control over those independent funds. A judgment in this case would thus be paid with PHEAA funds, not funds belonging to the Commonwealth. And given PHEAA's control over its sizeable corporate wealth, there is little likelihood that a judgment against PHEAA, even one that exceeds its current revenues, would imperil its survival such that the Commonwealth would effectively be required to swoop in with financial support.[16] Accordingly, in light of PHEAA's "anticipated and

---

likelihood that the Commonwealth's help would be required to satisfy the hypothetical judgment. To the extent that PHEAA suggests that Hutto's "hypothetical" inquiry requires us to imagine not only a judgment that exceeds PHEAA's revenues, but also that PHEAA's accumulated cash and other assets have vanished, that proposition is not only an over-reading of Hutto, but also inconsistent with Hess, which considered real, not imaginary, financial information when rejecting arm-of-state status. See Hess, 513 U.S. at 36.

[16] Although PHEAA's chairman stated in his declaration that the Commonwealth "would have no choice but to appropriate money" for PHEAA if a "significant judgment" were entered against it, J.A. 248, the chairman did not identify any facts supporting his opinion. Cf. Williams v. Giant Food, Inc., 370 F.3d 423, 433 (4th Cir. 2004) (explaining that a "mere[] . . . self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment"). Moreover, the record evidence that shines light on this issue points to the opposite conclusion, given that the Commonwealth did not replenish PHEAA's coffers after it (Continued)

47

actual financial independence," Hess, 513 U.S. at 49, the district court erred in finding the Commonwealth of Pennsylvania functionally liable for a judgment against PHEAA. And because Pennsylvania is neither legally nor functionally liable, the state-treasury factor therefore "weighs heavily against holding that PHEAA is an arm of the state." Oberg II, 745 F.3d at 139; see Cash, 242 F.3d at 225 (explaining that if the state treasury will not be affected by a judgment, that fact weighs against arm-of-state status).

## B.  Autonomy

The second arm-of-state factor requires us to determine "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." Oberg I, 681 F.3d at 580 (internal quotation marks omitted). "Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell

---

paid millions of dollars to settle the disputes with the Department of Education and the IRS, nor did the Commonwealth provide extra funds when PHEAA had a $27-million operating loss in 2008. Under these circumstances, the chairman's unsupported opinion about actions the Commonwealth might take cannot establish functional liability. Cf. Cash, 242 F.3d at 225 (speculative effect on state treasury insufficient to establish functional liability).

property, and whether it is represented in legal matters by the state attorney general." Oberg II, 745 F.3d at 137 (citations omitted).

1.

In Oberg II, we held that while the composition of PHEAA's board, the gubernatorial-approval requirement for bond issuances and the Auditor General's oversight over PHEAA pointed towards arm-of-state status, other relevant factors, including PHEAA's financial independence and its corporate powers "strongly suggest[ed] that PHEAA is not an arm of the state." Id. at 139. Giving Oberg the benefits of all reasonable inferences, we held that the autonomy factor "counsels against holding that PHEAA is an arm of the state." Id.

On remand, the district court concluded that the facts developed through discovery made "Pennsylvania's control over PHEAA . . . quite clear." Oberg III, 77 F. Supp. 3d at 498. The district court believed that the composition of PHEAA's board -- gubernatorial appointees and state legislators or officials -- "gives the Commonwealth significant control over the direction of PHEAA." Id. The court also noted that "Pennsylvania retains several forms of veto power over PHEAA's actions. The Treasurer must, as with all agencies, approve all expenditures, the Governor must approve all of PHEAA's debt issuances, and the Attorney General must approve all PHEAA

49

contracts in excess of $20,000." Id. The district court explained that, "[a]lthough PHEAA's funding and partial fiscal autonomy weighs against a finding that PHEAA is a state agency, most of the evidence shows substantial Commonwealth control and supports finding PHEAA to be an arm of Pennsylvania." Id.

Oberg argues on appeal that the district court's analysis of the autonomy factor is inconsistent with our analysis in Oberg II. In Oberg's view, the evidence produced through discovery demonstrates that PHEAA in fact operates autonomously, without significant oversight or control by the Commonwealth. We agree with Oberg that the statutory scheme governing PHEAA's operation and the evidence in the record establish PHEAA's operational autonomy. See Oberg II, 745 F.3d at 141 (describing the ultimate question as whether "PHEAA is truly subject to sufficient state control to render it a part of the state" (emphasis added; internal quotation marks and alteration omitted)).

2.

The record contains substantial evidence showing that PHEAA operates autonomously, largely free from state interference in its substantive decisions.

The "[m]ost critical[]" evidence of PHEAA's autonomy is evidence of its "financial[] independen[ce]." Id. As already discussed, the evidence developed through discovery confirmed

50

the financial independence we assumed in Oberg II. PHEAA is not dependent on state money for its survival and has not received appropriated funds for operational support since 1988. PHEAA supports itself through its commercial financial-services activities, through which it earns hundreds of millions of dollars annually and has accumulated more than $1 billion in net assets. PHEAA is statutorily vested with control over those funds, see 24 Pa. Stat. §§ 5104(3), 5105.10, and the evidence from PHEAA's own officials establishes that PHEAA in fact exercises that statutory control, see, e.g., J.A. 2469 (PHEAA treasurer acknowledging that PHEAA board makes the financial decisions reflected in PHEAA's annual report to Governor and General Assembly); J.A. 249 ("PHEAA's Board reviews, analyzes and approves PHEAA's internal budget, which is proposed by management and presented to the Board."). PHEAA's control over its substantial, independently generated revenues thus establishes PHEAA's financial independence, which is a critical component of operational autonomy. See Oberg II, 745 F.3d at 139.

Testimony from PHEAA board members also shows the lack of involvement by the General Assembly in PHEAA's operational affairs. When asked whether the General Assembly "submit[ted] policy or business recommendations" to PHEAA, one of the non-legislative members of the board responded,

51

The Legislature created PHEAA. . . . [I]t told them what they have to do, give them the business operation to take care of the students of Pennsylvania.

That was the Legislature's role. That's their only role at this point. They change their mind, they can create a statute to change it.

J.A. 3353. The absence of significant legislative control or oversight is also reflected in the testimony of PHEAA's chairman, who stated that "[i]f the Speaker of the House or any member of the General Assembly would ask me a question regarding PHEAA, I certainly would meet with them and discuss whatever the matter is with them. But I do not report back to anyone in the General Assembly." J.A. 2696; see also Declaration of PHEAA Chairman of the Board, J.A. 249 ("The Board oversees PHEAA, makes the policy decisions for the direction of [the] agency, and tasks PHEAA's executives and managers with implementing those decisions and directions on a day-to-day basis.").[17]

---

[17] In his declaration in support of PHEAA's motion for summary judgment, PHEAA's chairman stated that "I know from my tenure on the Board and as its Chairman that by virtue of the composition of PHEAA's Board with members of the legislative and executive branches, the Commonwealth exercises absolute control over PHEAA." J.A. 248 (emphasis added). Oberg II, of course, forecloses any argument that the composition of the board establishes absolute control. Moreover, as we have previously indicated, a witness's conclusory assertion of the answer to a legal question is not controlling. Cf. Doren v. Battle Creek Health Sys., 187 F.3d 595, 598-599 (6th Cir. 1999) (explaining that conclusory affidavits "restating the requirements of the law" but containing no "specific facts" do not "create a genuine issue of material fact sufficient to defeat summary judgment").

52

The broad range of powers statutorily granted to PHEAA is also important evidence of PHEAA's operational autonomy. "PHEAA has the power to enter into contracts, sue and be sued, and purchase and sell property in its own name, all of which suggest operational autonomy." Oberg II, 745 F.3d at 139. The statutes granting PHEAA control over its funds on deposit with the Treasury similarly are evidence of PHEAA's operational autonomy. See 24 Pa. Stat. §§ 5104(3), 5105.10,

PHEAA's creation and support of PHEF also provides powerful evidence of PHEAA's autonomy. Even though PHEAA is statutorily authorized to solicit and accept charitable donations, it created PHEF and gave PHEF more than $10 million a year to do that job.[18] And it did so in the absence of express statutory authority to create and support a dependent charitable organization, and without any involvement of the Governor or General Assembly beyond the routine review-and-approval processes of the Treasury Department and the Attorney General. PHEF thus provides a telling example of PHEAA exercising the financial and operational autonomy granted to it by statute.

Another telling example of PHEAA's financial and operational autonomy involves an unsolicited, $1-billion buy-out

---

[18] From all that appears in the record, PHEF did its job quite poorly. PHEF collected $11 million in private contributions over a six-year period in which PHEAA provided PHEF with more than $86 million in cash and donated services.

offer made in 2005 by the SLM Corporation, better known as Sallie Mae. PHEAA's board rejected the offer on its own, without direction from the Governor or General Assembly.

PHEAA's response to a dispute about billing calculations with the agency administering Commonwealth employee-benefit programs provides another concrete example of PHEAA's independence from the Commonwealth. After the billing dispute arose, PHEAA's board first explored the possibility of providing health benefits "outside" the Commonwealth. J.A. 2880. Eventually, the board unilaterally reduced the amount it paid the agency for its employees' health benefits. See J.A. 2881. In our view, these actions show autonomy on the part of PHEAA, not domination by the Commonwealth.

Moreover, PHEAA itself routinely asserts its financial strength and its independence from the Commonwealth. For example, PHEAA has described itself as an "independent public corporation," J.A. 3407, and as "a self-funded organization with operations similar to a not-for-profit business," J.A. 3408. See also J.A. 3020 (letter from a PHEAA vice-president to a Pennsylvania newspaper defending PHEAA's salaries and bonuses and distinguishing PHEAA from a "typical state agency").

Similarly, the Commonwealth has indicated, through both formal and less-formal channels, its lack of control over PHEAA. On the formal side, the Commonwealth's Comprehensive Annual

54

Financial Reports state that the Commonwealth "does not significantly impose its will on the PHEAA." J.A. 596. Less formally, after PHEAA rejected the Sallie Mae offer, a spokesman for then-Governor Edward Rendell stated, "We have no influence over PHEAA's decision-making." J.A. 3364.

When this evidence is considered along with PHEAA's statutory corporate powers and its statutory control over its funds on deposit with the Treasury, we believe it convincingly establishes that PHEAA operates independently, without significant interference from the Commonwealth. See, e.g., Vogt v. Board of Commissioners, 294 F.3d 684, 694-95 (5th Cir. 2002) (finding levee district to be autonomous for arm-of-state purposes because district "has considerable management authority . . . [and] no branch of government exercises supervisory control over the day-to-day operations of the levee district" (internal quotation marks omitted)).

3.

While there is evidence showing a certain level of Commonwealth control over PHEAA, it does not change our view of PHEAA's autonomy.

The most significant evidence of state control is that involving the Attorney General. As described above, PHEAA must submit contracts over $20,000 to the Attorney General for a "form and legality" review determining whether the "contract is

55

in improper form, not statutorily authorized or unconstitutional." 71 Pa. Stat. § 732-204(f)). A Deputy Attorney General explained the review process:

> Our standard under the statute is form and legality, and what that includes is . . . the form of the contract. . . . Does it comply with the contract law, also does it include terms that are required of a Commonwealth contract, and does it not include terms that would be prohibited in a Commonwealth contract.
>
> Then we look to authority. Does the agency as a public agency have the statutory authority to engage in this type of transaction, are there any other statutes or court decisions that would allow or preclude the contract. And then, thirdly, we look at the constitutionality. As a public agency, is this type of thing constitutional in the state or federal constitution.
>
> If all that is all right, we approve it. We do not look to business judgment. We do not look to financial issues. We do not look to political issues.

J.A. 3055; see also J.A. 3058 (agreeing that "the Attorney General's Office is not getting involved in business matters," only "legal formalities to ensure that it complies with Pennsylvania law"; J.A. 3095 ("I don't look at the business. I don't look [at whether it] is . . . a good idea. I don't look [at whether it] is . . . what I would do in their place. I look to legal issues."). Thus, much like the Treasury Department's payment-approval process, the Attorney General's review process is a checklist-driven, essentially non-substantive review process.

56

Although the review process is largely ministerial, there is no doubt that it amounts to an exercise of state control that restricts PHEAA's autonomy to some degree. The other aspects of the Attorney General's involvement in PHEAA's affairs, such as the requirement that the Attorney General represent PHEAA in litigation absent a delegation of authority and the binding nature of any legal opinions issued by the Attorney General, likewise must be understood as restrictions on PHEAA's autonomy.

Other indications of PHEAA's lack of autonomy relied upon by PHEAA derive from the general statutory provisions governing PHEAA's finances and operations: PHEAA was created by the Commonwealth, can exercise only those powers granted to it by the Commonwealth, and can be dissolved by the Commonwealth. Under the statute in force during the time relevant to Oberg's complaint, PHEAA's 20-member board was composed of gubernatorial appointees and state officials, which suggests some level of state control. See Oberg II, 745 F.3d at 139. In addition, PHEAA must deposit its commercial revenues in the state Treasury, and the Treasurer must approve payments made from those funds. The Governor must approve PHEAA's debt issuances, and the General Assembly has capped the total amount of debt PHEAA can incur. PHEAA is required to report its financial condition annually to the Governor and General Assembly, and it is subject to audit by the Commonwealth's Auditor General.

57

PHEAA is also subject to the Commonwealth's Sunshine Act, see 65 Pa. Cons. Stat. § 701, and its Right-To-Know Law, see 65 Pa. Cons. Stat. § 67.102.[19] All of these statutory facts were considered by the court in Oberg II but were insufficient in the face of PHEAA's statutory control over its funds to tip the autonomy factor to PHEAA's favor. Our review of the record gives us no basis for striking a different balance.

Of the various statutory strings that tie PHEAA to the Commonwealth, some are more important than others. For example, the requirement that PHEAA annually report to the Governor and General Assembly, and the applicability to PHEAA of the open-meetings and right-to-know laws, are "minor strings," Takle v. Univ. of Wis. Hosp. & Clinics Auth., 402 F.3d 768, 771 (7th Cir. 2005), that have little practical effect on PHEAA's independence and are not dissimilar from requirements imposed by the state on other political subdivisions.[20] While they are relevant to the

---

[19] Certain of PHEAA's contracts are exempt from the Right-To-Know Law. See 24 Pa. Stat. § 5104(1.1)(iii).

[20] See 65 Pa. Cons. Stat. § 703 (Sunshine Act applies to "any political subdivision of the Commonwealth," which is defined to include "[a]ny county [or] city"); 65 Pa. Cons. Stat. § 67.102 (Right-To-Know Law applies to a "local agency," which is defined as "[a]ny political subdivision, intermediate unit, charter school, cyber charter school or public trade or vocational school," and "[a]ny local, intergovernmental, regional or municipal agency, authority, council, board, commission or similar governmental entity."); 53 Pa. Cons. Stat. § 8110 (requiring local governments to submit a "debt statement" (Continued)

58

arm-of-state analysis, these minor strings ultimately do little work in distinguishing arms of the state from independent political subdivisions. See Regents, 519 U.S. at 429, n.5 (arm-of-state inquiry seeks to determine whether "a particular state agency has the same kind of independent status as a county or is instead an arm of the State"). Accordingly, while we conclude that these minor strings do point towards arm-of-state status, they do not carry much weight in the final analysis.

There is no doubt, however, that some of the more important statutory strings tying PHEAA to the state, such as the payment-approval process of the Treasury Department and the oversight exercised by the Attorney General, operate to restrict PHEAA's autonomy to a certain degree. The arm-of-state inquiry, however, does not turn on whether the entity is subject to any amount of state regulation at all, or whether it is subject to more regulation than a private business, but whether the entity functions independently of the state despite the state regulation to which it is subject. See Oberg I, 681 F.3d at 580 (explaining that the arm-of-state factors "endeavor to draw the line between a State-created entity functioning independently of the State from a State-created entity functioning as an arm of

--------

to the Department of Community and Economic Development of the Commonwealth before issuing bonds).

the State or its alter ego" (internal quotation marks omitted));

Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1205 (1st Cir. 1993) ("[The arm-of-state factors] are designed to disclose the extent to which state law endows the incorporated State-related entity with the operational authority, discretion, and proprietary resources with which to function independently of the State.").

In this case, the relevant state statutes simply do not amount to "pervasive control over PHEAA," as PHEAA contends. Brief of Respondent at 27. These statutory restrictions operate predominantly at the administrative edges rather than the discretionary heart of PHEAA's authority. They may dictate the manner in which PHEAA pays its bills, or require the inclusion or exclusion of a few contract clauses, but they do not intrude on PHEAA's exercise of its substantive discretion.[21] When the question is whether a state exercises such control over an entity that the entity "is simply a tool of the state," Oberg II, 745 F.3d at 139, control over matters of substance is what

---

[21] In 2007, a firestorm of criticism erupted after PHEAA spent more than $80,000 on tickets to Hershey Park for employees and their guests as part of PHEAA's annual "Employee Appreciation Day" at the park. J.A. 3019. The contracts and payments associated with the event were routinely processed through and approved by the Attorney General's office and the Treasury Department. See J.A. 2478, 2840. Had these review processes been substantive, as PHEAA insists they are, the road to approval of these expenses would likely have been bumpier.

matters. See United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah, 472 F.3d 702, 720 (10th Cir. 2006) (state-created entity autonomous under arm-of-state test because entity's board of directors "sets policies and operational objectives" and entity's "day-to-day operations are independent" (internal quotation marks omitted)); cf. Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 385, 399 (1995) (finding Amtrak to be a governmental entity against whom a First Amendment claim could be brought, notwithstanding statutory directive that it "be operated and managed as a for profit corporation," because the federal government exerts control over Amtrak "as a policymaker" (emphasis added; internal quotation marks omitted)).

As discussed above, the record establishes that PHEAA, not the Commonwealth, controls PHEAA's funds and makes the substantive decisions governing the focus and direction of the company and its day-to-day operations.[22] We therefore conclude

---

[22] According to PHEAA, it does not matter whether the Commonwealth actually exercises control over PHEAA; "[i]t is the Commonwealth's indisputable authority to veto PHEAA's legal decisions that is relevant." Brief of Respondent at 34, n.16. In making this argument, PHEAA again ignores Oberg II, which vacated and remanded for discovery "on the question whether PHEAA is truly subject to sufficient state control to render it a part of the state." Oberg II, 745 F.3d at 141 (internal quotation marks and alteration omitted). If the mere existence of authority flowing from the statutes relied upon by PHEAA were sufficient to resolve the autonomy question, discovery would not
(Continued)

that the autonomy factor weighs heavily against arm-of-state status.

## C.  State Concerns

The third arm-of-state factor requires us to consider "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." Oberg I, 681 F.3d at 580 (internal quotation marks omitted).  "'Non-state concerns,' however, do not mean only 'local' concerns, but rather also encompass other non-state interests like out-of-state operations." Oberg II, 745 F.3d at 137.

In Oberg II, we found this factor weighed in favor of arm-of-state status because PHEAA's focus on improving access to higher education was a matter of "legitimate state concern." Oberg II, 745 F.3d at 140.  In the course of this ruling, we rejected Oberg's argument that "due to PHEAA's commercial focus, its operations do not involve an area of legitimate state concern," id. at 139-40, as well as his argument that PHEAA's extensive out-of-state commercial activities showed that PHEAA was not primarily focused on state concerns, see id. at 140.

---

have been required.  Moreover, given the based-on-the-pleadings conclusion in Oberg II that the autonomy factor weighed against arm-of-state status, see Oberg II, 745 F.3d at 139, the Oberg II court necessarily concluded that the level of state control reflected in the governing statutes was outweighed by PHEAA's statutorily vested control over its funds.

The district court on remand concluded that, notwithstanding PHEAA's substantial out-of-state activity and income, PHEAA's activities primarily involve state, rather than "non-state concerns." See Oberg III, 77 F. Supp. 3d at 499. In the court's view, "[t]he fact that PHEAA purchases, services, and guarantees loans to borrowers throughout the country does not constitute non-state concerns because this was done to generate earnings to return to Pennsylvania students and defray their costs." Id.

On appeal, Oberg argues that after discovery, the state-concerns factor weighs against arm-of-state status. As a sanction for PHEAA's discovery violations, the magistrate judge ordered that "it shall be taken as established . . . that from 2002 to [October 2014], the majority of PHEAA's revenue and income was derived from out-of-state activity." J.A. 172. Oberg contends that our analysis in Oberg II makes the percentage of out-of-state earnings determinative of this factor. Accordingly, because it is now established that the majority of PHEAA's revenues are generated by out-of-state activities, Oberg argues that the district court erred in

concluding that the state-concern factor weighed in favor of arm-of-state status.[23]

Although Oberg II clearly makes the amount of out-of-state activity relevant, see Oberg II, 745 F.3d at 137, we do not believe it makes out-of-state activity dispositive, as Oberg argues. Addressing Oberg's argument in the prior appeal that PHEAA's operations "were so focused out of state that PHEAA was not involved primarily with state concerns," we noted that the complaint alleged that in 2005, "one-third of PHEAA's earnings came from outside the Commonwealth." Oberg II, 745 F.3d at 140 (internal quotation marks and alterations omitted). We then explained that if "one-third of PHEAA's earnings came from outside Pennsylvania in 2005, it does not seem plausible that by 2006 -- the last year encompassed by Dr. Oberg's allegations -- PHEAA's operations focused primarily out of state." Id.

Oberg II's observation that the complaint did not plausibly allege that the majority of PHEAA's revenues were earned outside the state cannot be understood as an acceptance of Oberg's

---

[23] PHEAA makes various arguments about why Oberg's focus on the out-of-state percentage is irrelevant or unwise. See Brief of Respondent at 37-39. In making these arguments, however, PHEAA fails to acknowledge that Oberg II explicitly held that out-of-state operations are relevant to the state-concerns factor. See Oberg II, 745 F.3d at 137 ("'Non-state concerns,' however, do not mean only 'local' concerns, but rather also encompass other non-state interests like out-of-state operations." (second emphasis added)).

argument that an entity cannot be _primarily_ involved in state concerns if the entity earns more than half of its revenues from out of state. After all, Oberg II's analysis of the state-concerns factor considered facts beyond the in- versus out-of-state source of PHEAA's earnings, see id. at 140, and there is no reason to think those facts would suddenly become irrelevant the moment out-of-state earnings cross the halfway point. Accordingly, while we find it highly relevant to the state-concerns factor that "the majority of PHEAA's revenue and income was derived from out-of-state activity," J.A. 172, we do not believe that fact to be dispositive.

Instead, when evaluating this factor, we must continue to give weight to the fact that PHEAA's work -- "facilitat[ing] the attainment of education by supplying student financial aid services," Oberg II, 745 F.3d at 140 -- involves what Pennsylvania believes to be an "essential governmental function," 24 Pa. Stat. § 5105.6, and what we have concluded "is clearly of legitimate state concern," Oberg II, 745 F.3d at 140. We must also consider the fact that PHEAA does provide significant services to the citizens of Pennsylvania. See Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 459 (4th Cir. 1987) (considering whether the services provided by the entity inured primarily to the benefit of local residents rather than state citizens in general). PHEAA administers the

State Grant Program and distributes every penny of its state appropriations to qualifying students, and it has on several occasions made significant contributions of its own earnings to the state program.  Thus, to the extent that PHEAA's business activities inure to the benefit of anyone other than itself and its employees, they inure to the benefit of Pennsylvania citizens.

After considering all of these facts and the relevant statutory provisions, we conclude that PHEAA's case for arm-of-state status under this factor has been weakened by discovery. The extent of PHEAA's out-of-state earnings is relevant to the state-concern factor, see Oberg II, 745 F.3d at 137, and discovery has established those earnings at a level Oberg II believed "implausible," id. at 140.  Nonetheless, in light of the other relevant facts noted above, we believe this factor still points towards arm-of-state status, but just barely.

D. Treatment under State Law

The final arm-of-state factor requires us to consider how the entity is treated under state law. "In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." Id. at 138 (internal quotation marks omitted). Noting that PHEAA was created to perform an "essential government function" for

66

the benefit of the state's citizens and that Pennsylvania courts treat PHEAA as a state agency, this court in Oberg II concluded that the state-law factor weighed in favor of arm-of-state status. Oberg II, 745 F.3d at 140.

The district court reached the same conclusion on remand. The district court observed that PHEAA was created by the General Assembly, that "[a]ll of PHEAA's limited powers and authority come from the General Assembly by statute," Oberg III, 77 F. Supp. 3d at 499, that it is exempt from state taxation, that it is subject to Pennsylvania open-meeting and right-to-know laws, and that its employees are treated as Commonwealth employees. The district court thus concluded that "Pennsylvania law clearly regards PHEAA as a state agency," id. at 499, a conclusion that "weighs heavily in favor of finding PHEAA to be an arm of the state," id. at 500 (emphasis added).

We agree with the district court that PHEAA is generally treated as a state agency under state law. We see nothing in the record, however, to support the heavy weight the district court assigned to this factor. As the district court noted, discovery established that PHEAA employees are treated as Commonwealth employees for purposes of payroll, retirement, and health-care benefits, which perhaps shows that the state treats PHEAA as it does traditional state agencies. But discovery also yielded evidence showing the state treats PHEAA differently than

it does traditional agencies -- for example, PHEAA management employees are not paid in accordance with Commonwealth pay scales; governors ask PHEAA to return appropriated funds when times are tight but direct other agencies to do so; and the Commonwealth acknowledges in its financial reports that it does not impose its will on PHEAA. While the statutes and state-court decisions relied on in Oberg II remain sufficient to tip this factor towards arm-of-state status, see Oberg II, 745 F.3d at 140, the factual information learned through discovery falls fairly evenly on both sides of the scale. Accordingly, although this factor weighs in favor of arm-of-state status, we cannot conclude that it weighs heavily in favor.

V.

Our analysis of the arm-of-state factors thus brings us to this point. As to the state-treasury factor, Oberg II's determination that Pennsylvania is not legally liable for a judgment against PHEAA remains controlling. And as to functional liability, the keys facts assumed by the court in Oberg II -- PHEAA's control over its significant, independent corporate wealth -- were confirmed through discovery and foreclose a finding of functional liability. Because the Commonwealth of Pennsylvania is neither legally nor functionally liable for a judgment against PHEAA, the state Treasury is not

68

implicated in this case, and the first factor weighs heavily against arm-of-state status.

As to the autonomy factor, the statutes and evidence described above establish that PHEAA exercises control over its revenues, makes policy decisions, sets its own budget, and otherwise manages the day-to-day activities of the company without significant interference from the Commonwealth. The areas in which the state exercises some amount of control primarily involve ministerial matters and do not diminish PHEAA's control over substantive matters. Because the Commonwealth vests PHEAA with a significant amount of autonomy, this factor also weighs heavily against arm-of-state status.

As to the state-concerns factor and the state-law factor, both weigh in favor of arm-of-state status. Since it has been established for purposes of this case that the majority of PHEAA's revenues during the relevant period were generated through out-of-state activities, however, the state-concerns factor only weakly points to arm-of-state status.

If we simply did the math, so to speak, the factors would add up to "political subdivision," not "alter ego of Pennsylvania." Arm-of-state status, however, is a question of balance, not math. In cases like this one, where the arm-of-state "indicators point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide."

69

<u>Hess</u>, 513 U.S. at 47.  In our view, these twin reasons -- "the protection of state treasuries and respect for the sovereign dignity of the states," <u>Gray v. Laws</u>, 51 F.3d 426, 432 (4th Cir. 1995) -- guide us to the same conclusion:  For purposes of federal law, PHEAA is a political subdivision, not an arm or alter ego of Pennsylvania.

PHEAA is a very wealthy corporation engaging in nationwide commercial student-loan financial-services activities.  It is statutorily vested with substantive control over its commercial revenues, and it in fact exercises control over those revenues. Its commercial revenues have made PHEAA entirely self-sufficient, and the Commonwealth has not appropriated funds for PHEAA's operational support since 1988.  The Commonwealth does not assert ownership of PHEAA's commercial revenues, and it is neither legally nor functionally liable for a judgment against PHEAA.  Permitting this action to proceed against PHEAA thus does not place the Pennsylvania treasury at risk.

Permitting the action to proceed likewise does not offend the sovereign dignity of Pennsylvania.  Although the Commonwealth has imposed some not-insignificant restrictions on PHEAA's operations, the Commonwealth has nonetheless vested PHEAA with broad power over its finances and operations.  PHEAA, not the Governor or the General Assembly, sets policy for the corporation and makes the substantive fiscal and operational

70

decisions. Indeed, the Commonwealth admits in its public financial statements that it cannot impose its will on PHEAA. Thus, the Commonwealth has structured PHEAA to be financially and operationally independent, and PHEAA in fact operates independently, without significant Commonwealth interference or substantive supervision. In light of PHEAA's intended and actual independence from the Commonwealth, we cannot conclude that it would be an affront to Pennsylvania's sovereign dignity to permit this action to proceed against PHEAA. See Hess, 513 U.S. at 52 ("[T]he Port Authority is financially self-sufficient; it generates its own revenues, and it pays its own debts. Requiring the Port Authority to answer in federal court . . . does not touch the concerns -- the States' solvency and dignity -- that underpin the Eleventh Amendment.").

We therefore conclude that PHEAA is an independent political subdivision, not an arm of the Commonwealth, and that PHEAA is therefore a "person" subject to liability under the False Claims Act. In our view, any other conclusion "would . . . heighten a mystery of legal evolution" by "spread[ing] an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State's wealth." Hess, 513 U.S. at 51, n.21 (internal quotation marks omitted). Accordingly, we hereby vacate the district court's grant of summary judgment in

71

favor of PHEAA, and we remand for further proceedings on the merits of Oberg's FCA claims against PHEAA.

<u>VACATED AND REMANDED</u>